# UNITED STATES v. STANDARD OIL CO. OF CALIFORNIA et al.

Civ. No. 6159–Y.

District Court, S. D. California, Central Division.

June 7, 1948.

Supplemental Opinion June 28, 1948.

852

See also 7 F.R.D. 338.

William C. Dixon, Sp. Asst. to the Atty. Gen., W. Alan Thody, Sp. Asst. to the Atty. Gen., Lawrence W. Somerville, Sp. Atty., Anti-Trust Division, of San Francisco, Cal., Edwin U. Driscoll, Sp. Atty., Anti-Trust Division, of Los Angeles, Cal., Tom C. Clark, Atty. Gen., and James M. Carter, U. S. Atty., of Los Angeles, Cal., for plaintiff.

Lawler, Felix & Hall and John M. Hall, all of Los Angeles, Cal., Pillsbury, Madison & Sutro and Everett A. Mathews, all of San Francisco, Cal., for defendants.

YANKWICH, District Judge.

By this suit in equity, the Government seeks a decree adjudging that certain practices engaged in by the defendants and certain contracts entered into by them, unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Anti-Trust Act [1], and substantially lessen competition and tend to create a monopoly in a line of commerce, in violation of Section 3 of the Clayton Act.[2] The Government asks us to declare the exclusive supply provisions in the contracts and the practices flowing from them to be void and of no effect.

In addition, we are asked to enjoin the defendants, in perpetuity, from entering into or enforcing any contract, agreement, or understanding, express or implied, with any independent service station operator or garage operator, or from inducing or compelling, or attempting to induce or compel, any such person from entering into any contract, agreement or understanding, which has any of the following requirements:

(a) That the Independent Service Station Operator or Garage Operator shall secure all his requirements of petroleum products from defendant Standard, or shall not handle the petroleum products of any other company;

(b) That the Independent Service Station Operator, or Garage Operator shall secure all his requirements of any one or more types of automobile accessories from or through defendants Standard and Standard Stations, Inc., or will not handle accessories competitive with those distributed or sponsored by defendants, Standard and Standard Stations, Inc.

(c) That the sale of any petroleum product or automotive accessories to any Independent Service Station Operator, or Garage Operator shall be conditional on the sale of other petroleum products or automotive accessories.

The action was instituted on January 2, 1947. Many proceedings have taken place before the trial and an extensive file has been built up. However, as a case of this character must be determined on the basis of facts existing at the time of the trial, it is not necessary to give a detailed analysis of the pleadings in the case or of all the proceedings before the court.

What precedes is sufficient for the purpose of the discussion to follow.

## I.

### The Proved Facts.

Notwithstanding the lengthy trial and the large number of exhibits introduced, the issues in the case are rather narrow, as will appear further on in the opinion when we expound the legal principles which control the case.

There is, therefore, no need to review elaborately the facts proved. A brief summary will suffice.

The defendant Standard Oil Company of California is a Delaware corporation with its principal California office at San Francisco, California. It is engaged in the business of producing, transporting, refining and marketing petroleum and petroleum products, principally in the states of California, Oregon, Washington, Arizona, Nevada, New Mexico, Idaho and Utah.

---

[1] 15 U.S.C.A. § 1.

[2] 15 U.S.C.A. § 14.

The defendant Standard Stations, Incorporated, is a corporation organized under the laws of Delaware with its principal California office at San Francisco. It is a wholly-owned subsidiary of Standard Oil Company of California, and is engaged in the business of managing service stations in the seven states just mentioned. The number of these stations is 1063.

As the issues have been narrowed by the proof, no further reference need be made to stations so operated, which have been referred to in the evidence as "employe operated stations." The Government does not question (indeed, it could not) the right of the Standard Oil Company of California to operate its own stations and sell therein any product it manufactures or distributes. Hence when we refer to "Standard" in what follows, it will be understood that the reference is to Standard Oil Company of California, the parent company, actually engaged in what, for brevity, we shall call "the oil business".

The evidence in the cases shows that, as of March 12, 1947, Standard, in addition to the company operated service stations, had 7,145 contractual arrangements with 5,197 stations in the area. The relationship of Standard to these stations was governed by the five types of agreement entered into with the operators of the stations. They were:

(1) "Dealer Agreements," of which there were 1,656, containing the following clause:

"1. Standard Oil Company of California, a corporation hereinafter called 'Company' agrees to sell to ———— hereinafter called 'Dealer', and Dealer agrees to buy from Company, all of Dealer's requirements of petroleum products used or sold or bought to be used or sold by Dealer at ————. The petroleum products to meet Dealer's requirements hereunder shall be those brands of gasoline, lubricating oils, and other petroleum products sold by Company to its dealers generally in Dealer's vicinity.

(2) "Distributor Agreements", of which there were 556, having the following provisions:

"Company agrees to sell to Distributor, and Distributor agrees to buy from Company and stock and offer for sale all of Distributor's requirements of petroleum products used or sold or bought to be used or sold by Distributor in the conduct of his business on the premises hereinafter described. The petroleum products to meet Distributor's requirements hereunder shall be those brands of gasoline, lubricating oils and other petroleum products currently sold at service stations operated by Standard Stations, Inc., in Distributor's vicinity, and Distributor agrees not to store, handle, distribute, or sell any other brand or brands of petroleum products at or from the station."

(3) "Petroleum Products and Equipment Agreements", of which there were 912, carrying this clause:

"1. Standard Oil Company of California, a corporation, hereinafter called 'Company', agrees to sell to ———— hereinafter called 'Dealer', and Dealer agrees to buy from Company, all of Dealer's requirements of petroleum products used or sold or bought to be used or sold by Dealer at ————. The petroleum products to meet Dealer's requirements hereunder shall be those brands of gasoline, lubricating oils, and other petroleum products sold by Company to its dealers generally in Dealer's vicinity."

(4) "Dealer Agreement TBA", of which there were 2,221, having this clause:

"1. Standard Oil Company of California, hereinafter called 'Company', agrees to ———— hereinafter called 'Dealer', and Dealer agrees to buy from Company, all Dealer's requirements of petroleum products used, sold, or bought to be used or sold, by Dealer at ————, hereinafter called 'said premises'. The petroleum products to meet Dealer's requirements hereunder shall be those brands of such products generally sold by Company to its Dealers."

(5) "Sublease Agreements", of which there were 1,800, containing the following clause:

"Lessee shall handle and sell on the leased premises only such petroleum products as are sold Lessee by Lessor, and Lessee agrees not to store, handle, sell, or distribute on

or from said premises any petroleum products of any description other than those petroleum products sold to Lessee by Lessor. The price payable by Lessee to Lessor for said petroleum products shall be Lessor's posted price for the same or similar products to its Dealers generally in Lessee's vicinity at time and place of delivery."

The choice of the type of agreement was the dealer's. And the agreements were terminable by him on six months' notice. Each of these agreements contained provisions which, both by the language used and the limitations of liability, stressed the character of the agreement as seeking to establish the dealer as an independent contractor. Dealer Agreements (Class I) contained the most elaborate provisions. They are here given in full:

"6. Dealer acknowledges that he has thoroughly inspected the pumps, tankage, containers, pipes, and other facilities on the premises and that the same are in good condition, and while this agreement is in force Dealer agrees to so keep the same at Dealer's own cost and expense; provided, however, that Company may, at its discretion, maintain and repair said facilities. Dealer further agrees to protect, defend, and hold harmless the Company against all claims for damage to property (including Dealer's property), or injury to or death of persons, directly or indirectly resulting from any acts or omissions of Dealer or Dealer's employees in or about said premises, either in the maintenance or operation of the tanks, containers, pipes, pumps and other facilities thereon, or in the vending therefrom of the products and goods handled by Dealer hereunder.

"7. In the performance of this agreement Dealer is engaged in an independent business and nothing contained shall be construed as reserving to Company any right to control Dealer with respect to his conduct in the performance of this agreement. Company reserves no right to exercise any control over any of Dealer's employees and all employees of the Dealer shall be entirely under the control and direction of Dealer who shall be responsible for their actions and omissions. Dealer will, at his own expense, during the term hereof, maintain full insurance under any Workmen's Compensation Laws effective in said state covering all persons employed by and working for him in connection with the performance of this agreement, and upon request shall furnish Company with satisfactory evidence of the maintenance of such insurance. Dealer accepts exclusive liability for all contributions and payroll taxes required under Federal Social Security Laws and State Unemployment Compensation Laws as to all persons employed by and working for him in connection with the performance of this agreement.

"8. Any tax, or the amount thereof, now or hereafter imposed, levied or assessed by any governmental authority upon, measured by, incident to, or as the result of the transaction herein provided for, or the transportation, production, or manufacture of the goods, the subject matter of this agreement, shall, if collectible or payable by the Company, be paid by the Dealer on demand by the Company, as tax collectible or as an increase in the prices otherwise herein provided for."

The other types of agreement aimed to achieve the same result.

The history of the use of the various types of agreement shows that, beginning in 1938, the dealer agreements began to supersede the authorized distributor agreements which had obtained before that date, and that, beginning with the year 1944, Type 4 (TBA) came into almost exclusive use. There is duplication of agreements in that a single station may operate under several types of agreement. Hence the actual number of gas station outlets is 5,197. The number of stations operating under Form 2 has since been reduced to 232. In addition to this, Standard had 742 open accounts and 1,063 company-operated stations, or, as they have been called in this case, employe-operated stations.

The evidence in the record shows beyond cavil that the effect of these agreements was to limit the dealer operating under any of them to the handling of the petroleum products of Standard and also to the marketing of tires, tubes, batteries and accessories controlled or handled by Standard.

If they handled others, they did not do so openly. The agreements were so interpreted by those operating under them,—as various operators from various states testified. Indeed, witnesses of the defendant very forthrightly stated that the operators were expected to confine themselves to Standard products and accessories, the exception being only those rare cases—especially during the War—when they were unable to supply the quantity asked, in which event, the supervising employes of Standard would "shut their eyes" to the infractions.

The record also shows that, as to tires, tubes and batteries, Standard reserved the right to determine the amounts it would furnish. As to the other accessories,—which included spark plugs, sun visors, fan belts, hub caps, and all small parts of automobiles which can easily be replaced at a service station—the requirement was up to the dealer himself. Tires, tubes and batteries were not, as a rule, sold to operators of stations other than those under contract with Standard,—especially during the time of shortage. Its petroleum products and accessories were sold to other station operators, particularly after the war scarcity ended. The representatives of other companies manufacturing petroleum products, tires, tubes, batteries and other accessories, testified that they could not sell their products to stations under contract with Standard, except in rare instances, and that, surreptitiously. When a station was converted into a Standard station, whatever custom in non-Standard products they had before ceased. To maintain the good will of the operators of the stations, Standard assisted them financially, made loans which were later discounted, furnished many valuable services, and expended large sums of money in advertising, in educating the operators in the manner of handling the products, in building the stations, adding facilities to them, repairing and improving them,—all of which meant large expenditures of money. As a result, Standard has a $16,500,000 capital investment in the dealer stations.

When salesmen or supervisors of Standard found competitive products, they "urged",—as they testified—or, as the operators testified, showed their displeasure, and, practically "ordered" their discontinuance or substitution. Many of the competitive products so offered for sale and shut out of the stations under contract with Standard were produced outside of the States in which the stations were located, or were shipped in interstate commerce.

So there cannot be any question that, at least so far as these products are concerned, the practice to which the Government complains, affected the flow of goods and products in interstate commerce.[3] The character of the result and its legality, as well as the legality of the restrictive clauses themselves are questions of law.

To them we now direct our attention.

## II.

### The Law Today.

(A) Exclusive Supply Provisions:

The case does not require an extended review of the principles which courts have evolved in interpreting the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, and Clayton Act, 15 U.S.C.A. § 12 et seq. I have had occasion to discuss the scope and nature of anti-trust legislation and its application both to activities which are local and to those which transcend state limits, in several opinions.[3]

There is another reason for confining ourselves to the more recent decisions of the Supreme Court: They have modified, to a great extent, some of the legal norms declared in prior cases.[4] And the problem in this case can be narrowed down to two

---

[3] United States v. Heating, Piping & Air Conditioning Contractors Ass'n, 1940, D.C.Calif., 33 F.Supp. 978; United States v. Food and Grocery Bureau of Southern California, 1942, D.C.Calif., 43 F.Supp. 966; United States v. Food and Grocery Bureau of Southern California, 1942, D.C.Calif., 43 F.Supp. 974; United States v. San Francisco Electrical Contractors Ass'n, 1944, D.C. Calif., 57 F.Supp. 57.

[4] Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L. Ed. 460; United States v. South-Eastern Underwriters Ass'n, 1944, 322 U.S. 533, 546–553, 64 S.Ct. 1162, 88 L.Ed. 1440; United States v. Frankfort Distilleries, Inc., 1945, 324 U.S. 293, 296–

rather simple inquiries. They are: (a) Are agreements of the type involved in this case,—as summarized briefly in the preceding portion of the opinion,—violative of either or both the statutes? Which, in reality, comes down to this: Is an agreement by an oil company, engaged in the production and distribution of petroleum products, and the sponsoring and distribution of automobile parts and accessories, which obligates a gasoline station operator to supply his full requirements of petroleum products, tires, tubes, batteries, and other accessories, from the company, *of itself, a* violation of either of the Acts? If the answer to this question is in the affirmative, the inquiry is at an end. (b) If in the negative, we must determine whether the effect of the agreement as a restraint on commerce makes it invalid under either or both Acts.

Seeking an answer to these inquiries, I begin with the assumption that the General Motors exclusive supply case [5] is still the law. Which means that, at least under the Clayton Act, an agreement by a dealer that, in consideration of being permitted to deal in a certain product, he will not sell or offer to sell any products not manufactured or handled by the particular manufacturer, is not per se illegal. The opinion in the General Motors case states the question involved tersely. The Court had before it an agreement which, not only indirectly forbade the handling of the products of other manufacturers, but *prohibited* specifically their use or sale in these words: " 'Dealer agrees that he will not sell, offer for sale, or use in the repair of Chevrolet motor vehicles and chassis second-hand or used parts or any part or parts not manufactured by the Chevrolet Motor Company * * *.' " [6]

This eliminated not only parts not manufactured by them, but also second-hand and used parts. A complete monopoly was achieved. At the same time, the dealer was not granted exclusive selling rights in new parts and accessories. General Motors was, therefore, free to grant to other dealers in the same territory the same rights. The trial court dismissed the bill for want of equity. Affirming the decree, the Supreme Court said: "Upon the evidence adduced at the trial, the District Court found that *the effect of the clause had not been in any way substantially to lessen competition or to create a monopoly in any line of commerce."* [7]

I take this language to mean that, even when we are confronted with a contract which shuts out competition, we must, under the Clayton Act, determine its effect on the line of commerce.

Under the Sherman Act, the reasonableness or unreasonableness of the restraint is,—since the first Standard Oil decision in 1911,—an element to be considered.[8] *Both are questions of fact, the solution of which rests upon the conditions obtaining in each particular case.*

The Socony-Vacuum case [9] and other cases which followed it express the view that the economic wisdom or unwisdom, or the economic benefit or detriment, of a restriction on commerce is not material, especially when we are dealing with a practice, such as price-fixing, which is illegal *per se.* But, at the same time, economic effect becomes material if we are dealing with a restraint other than price-fixing, a restraint which is monopolistic. Because, when this is the situation, it must appear that there is substantial lessening of competition or monopoly under the Clayton Act, before we can place a judicial

298, 65 S.Ct. 661, 89 L.Ed. 951; United States v. Yellow Cab Co., 1947, 332 U.S. 218, 224–226, 67 S.Ct. 1560, 91 L.Ed. 2010.

[5] Pick Mfg. Co. v. General Motors Corporation, 1936, 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4.

[6] Pick Mfg. Co. v. General Motors Corporation, supra, 299 U.S. at pages 3, 4, 57 S.Ct. at pages 1, 2, 81 L.Ed. 4.

[7] Pick Mfg. Co. v. General Motors Corporation, supra, 299 U.S. at page 4, 57 S.Ct. at page 1, 81 L.Ed. 4. (Emphasis added)

[8] Standard Oil Co. v. United States, 1911, 221 U.S. 1, 5, 55–62, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann. Cas.1912D, 734.

[9] United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 220–225, 60 S.Ct. 811, 84 L.Ed. 1129; See, Fashion Originators' Guild v. Federal Trade Commission, 1941, 312 U.S. 457, 468, 61 S.Ct. 703, 85 L.Ed. 949.

interdict on it. We find this language in the Socony-Vacuum case:

"Secondly, the fact that sales on the spot markets were still governed by some competition is of no consequence. *For it is indisputable that that competition was restricted through the removal by respondents of a part of the supply which but for the buying program would have been a factor in determining the going prices on those markets.* But the vice of the conspiracy was not merely the restriction of supply of gasoline by removal of a surplus. As we have said, this was a well organized program. The timing and strategic placement of the buying orders for distress gasoline played an important and significant role. Buying orders were carefully placed so as to remove the distress gasoline from weak hands. Purchases were timed. Sellers were assigned to the buyers so that regular outlets for distress gasoline would be available. The whole scheme was carefully planned and executed to the end that the distress gasoline would not overhand the markets and depress them at any time. And as a result of the payment of fair going market prices a floor was placed and kept under the spot markets. Prices rose and jobbers and consumers in the midwestern area paid more for their gasoline then they would have paid but for the conspiracy.

"Competition was not eliminated from the markets; but it was clearly curtailed, since restriction of the supply of gasoline, the timing and placement of the purchases under the buying programs and the placing of a floor under the spot markets obviously reduced the play of the forces of supply and demand.

"The elimination of so-called competitive evils is of no legal justification for such buying programs. The elimination of such conditions was sought primarily for its effect on the price structures. Fairer competitive prices, it is claimed, resulted when distress gasoline was removed from the market. But such defense is typical of the protestations usually made in price-fixing cases. Ruinous competition, financial disaster, evils of price cutting and the like appear throughout our history as ostensible justifications for price-fixing. If the so-called competitive abuses were to be appraised here, the reasonableness of prices would necessarily become an issue in every price-fixing case. In that event the Sherman Act would soon be emasculated; its philosophy would be supplanted by one which is wholly alien to a system of free competition; it would not be the charter of freedom which its framers intended."[10]

(B) Effect of Restriction:

■ What Mr. Justice Douglas says applies with greater force to a restrictive practice other than price-fixing. The fact that it may be beneficial is not material, if, in effect, it is an unreasonable restraint.[11]

Judge Learned Hand stressed these very points in the Fashion Originators' Guild case.[12] He applied the reasoning of the Socony-Vacuum case to a case not involving price-fixing. And, with that clarity of language so characteristic of his writing, he showed that economic benefits cannot be taken into consideration if, in fact, there be substantial restriction of commerce. The opinion says:

"* * * Many trade combinations which affect competition are lawful, when they are designed to prevent trade 'abuses'; they are 'reasonable,' though perhaps to say so is no more than to state the problem. Appalachian Coals, Inc. v. United States, 288 U.S. 344, 374, 53 S.Ct. 471, 77 L.Ed. 825; Sugar Institute v. United States, 297 U.S. 553, 598, 56 S.Ct. 629, 80 L.Ed. 859. Certainly it is not true that the lawfulness of every combination depends upon whether it 'reasonably' corrects trade 'abuses'; there are some combinations that nothing will excuse. The accepted rubric for this is that when the means are unlawful per se, the purposes of the confederates will not justify them. Sugar Institute v. United States, supra, 297 U.S. 553, at page 599, 56 S.Ct. 629, at page 642,

---

[10] United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at pages 220, 221, 60 S.Ct. at pages 842, 843, 84 L.Ed. 1129. (Emphasis added.)
[11] See, Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 1948, 68 S.Ct. 996, at page 1009.
[12] Fashion Originators' Guild v. Federal Trade Commission, 1940, 2 Cir., 114 F.2d 80.

80 L.Ed. 859. *The most recent example of this is the Supreme Court's reaffirmation of the unconditional illegality of price-fixing, in spite of the probability that the combination in fact benefited the industry.* United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. However grave the industrial disorders, that remedy was not permissible; the industry may restore itself by many devices, but not by all. * * * Price fixing is not, however, the only means unlawful per se; *the interest of the consumer is not all that determines the 'reasonableness' of a contract 'in restraint of trade.' It is also unlawful to exclude from the market any of those who supply it—assuming that there is no independent reason by virtue of their conduct to justify their exclusion —and it is no excuse for doing so that their exclusion will result in benefits to consumers, or to the producers who re-main.* W. W. Montague & Co. v. Lowry, 193 U.S. 38, 47, 24 S.Ct. 307, 48 L.Ed. 608; Eastern States Retail Lumber Dealers Association v. United States, 234 U.S. 600, 611, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A. 1915A, 788; Binderup v. Pathe Exchange, 263 U.S. 291, 311, 312, 44 S.Ct. 96, 68 L. Ed. 308; Anderson v. Shipowners Association, 272 U.S. 359, 363, 47 S.Ct. 125, 71 L.Ed. 298; Bedford Cut Stone Co. v. Journeymen Stone Cutter's Association, 274 U.S. 37, 54, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Paramount Famous Corporation v. United States, 282 U.S. 30, 43, 44, 51 S.Ct. 42, 75 L.Ed. 145; United States v. First National Pictures, Inc., 282 U.S. 44, 54, 51 S.Ct. 45, 75 L.Ed. 151; National Harness Association v. Federal Tr. Comm., 6 Cir., 268 F. 705, 712; Wholesale Grocers Ass'n v. Federal Tr. Comm., 5 Cir., 277 F. 657, 663; Butterick Publishing Co. v. Federal Tr. Comm., 2 Cir., 85 F.2d 522. There is another reason supporting this conclusion. A successful combination among a part of the producers to exclude others, even when not accompanied by an agreement fixing prices, puts into their hands collectively the power to control the supply and with it the price. The fact that that power is not at the mo-ment exercised is of no assurance that it may not be; if the effort succeeds and the combination is not disrupted, it may at any time be used, and there will then be no protection to the consumer.

"*Finally, it is of no consequence that the Guild does not supply the whole market for women's dresses; it aims at a monopoly however small its share of total sales.* The reason is as follows: Although all dresses made after one design are fungibles, the different designs themselves are not fungibles. Each has its own attraction for buyers; each is unique, however trifling the basis for preferring it may be. Hence to attempt to gather to oneself all possible reproductions of a given design is to attempt to create a monopoly, as at once appears from the fact that a copyright for it—and a fortiori a design patent upon it —would be ranked as a monopoly. It is true that the sanction of that monopoly may be very weak; it depends upon the design's attractions above other designs, often not a very important margin of advantage. But the same is true of nearly all monopolies, for there are substitutes for most goods. As to each design therefore the Guild is seeking to establish a monopoly; and *it is unimportant whether its gross sales are large or small, as compared with those of all women's dresses. For these reasons the combination was unlawful per se;* the Commission was right in refusing to hear any evidence in its excuse, for it could have no excuse; the case is the same as Millinery Creators' Guild v. Federal Trade Commission, supra, 2 Cir., 109 F.2d 175." [13]

The teaching of these cases is this: When we are dealing with price-fixing, we are dealing with a contract which is invalid per se and violative of the Act. However, when we consider any other restrictions, their legality must be determined *by the nature of the contract in relation to the line of commerce which it may affect.* A contract by a manufacturer of a product which binds an agent who is used as an outlet to the exclusive use of his product *is not necessarily* a vio-

---

[13] Fashion Originators' Guild v. Federal Trade Commission, supra, 2 Cir., 114 F.2d at pages 84, 85. (Emphasis added.)

lation of either the Sherman Act or the Clayton Act. But it *may be* so under the Sherman Act, if it result in an unreasonable restraint of trade, and under the Clayton Act, if it result in a monopoly in a line of commerce or lessens competition substantially.[14]

The more recent decisions of the Supreme Court reaffirm these principles.[15] To quote from Federal Trade Commission v. Morton Salt Company[16]:

"The statute requires no more than that the effect of the prohibited price discriminations 'may be substantially to lessen competition * * * or to injure, destroy, or prevent competition.' After a careful consideration of this provision of the Robinson-Patman Act [15 U.S.C.A. § 13], we have said that 'the statute does not require that the discrimination must in fact have harmed competition, but only that there is a reasonable possibility that they "may" have such an effect.' Corn Products Refining Co. v. Federal Trade Comm., 324 U.S. 726, 742, 65 S.Ct. 961, 969, 89 L. Ed. 1320. Here the Commission found what would appear to be obvious, that the competitive opportunities of certain merchants were injured when they had to pay respondent substantially more for their goods than their competitors had to pay. The findings are adequate.

"Fourth. It is urged that the evidence is inadequate to support the Commission's findings of injury to competition. As we have pointed out, however, the Commission is authorized by the Act to bar discriminatory prices upon the 'reasonable possibility' that different prices for like goods to competing purchasers may have the defined effect on competition. That respondent's quantity discounts did result in price differentials between competing purchasers sufficient to influence their resale price of salt was shown by evidence."

The following quotation from the American Crystal Sugar case is also enlightening:

"The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. Cf. United State v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575. The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated. Cf. United States v. South-Eastern Underwriters Ass'n. supra, 322 U. S. at page 553, 64 S.Ct. at page 1173, 88 L.Ed. 1440.

"Nor is the amount of the nation's sugar industry which the California refiners control relevant, *so long as control is exercised effectively in the area concerned.* Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co., 293 U.S. 268, 279, 55 S.Ct. 182,

14 See cases under Notes 8 to 12, inclusive. And see, Restatement of Contracts, Section 516; Wilder Mfg. Co. v. Corn Products Refining Co., 1915, 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520, Ann.Cas.1916A, 118; Federal Trade Commission v. Sinclair Refining Co., 1923, 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746; Twin City Pipe Line Co. v. Harding Glass Co., 1931, 283 U.S. 353, 51 S. Ct. 476, 75 L.Ed. 1112, 83 A.L.R. 1108; Associated Oil Co. v. Myers, 1933, 217 Cal. 297, 18 P.2d 668; General Petroleum Corporation v. Longhead, 1933, 218 Cal. 554, 24 P.2d 457; B. S. Pearsall Butter Co. v. Federal Trade Commission, 1933, 7 Cir., 292 F. 720; Excelsior Motor Manufacturing & Supply Co., v. Sound Equipment, 1934, 7 Cir., 73 F.2d 725.

15 United States v. Yellow Cab Co., 1947, 332 U.S. 218, 67 S.Ct. 1560, 91 L.

Ed. 2010; United States v. National Lead Co., 1947, 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077; International Salt Co., Inc. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12; United States v. National Lead Co., 1947, 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077; United States v. Line Material Co., 1947, 333 U.S. 287, 308–310, 68 S.Ct. 550; United States v. United States Gypsum Co., 1948, 333 U.S. 364, 388–393, 68 S.Ct. 525. And see, International Machines Corporation v. United States, 1936, 298 U.S. 130, 137–140; Oxford Varnish Corporation Ault & Wiborg Corporation, 1936, 6 Cir., 83 F.2d 764; Signode Steel Strapping Co. v. Federal Trade Commission, 1942, 4 Cir., 132 F.2d 48, 52–54.

16 Federal Trade Commission v. Morton Salt Company, 1948, 68 S.Ct. 822, at pages 828, 829.

185, 79 L.Ed. 356; United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S.Ct. 1560, 1564, 91 L.Ed. 2010, *the conspiracy being shown to affect interstate commerce adversely to Congress' policy.* Congress' power to keep the interstate market free of goods produced under conditions inimical to the general welfare, United States v. Darby, 312 U.S. 100, 115, 61 S.Ct. 451, 457, 85 L.Ed. 609, 132 A.L.R. 1430, may be exercised in individual cases without showing any specific effect upon interstate commerce, United States v. Walsh, 331 U.S. 432, 437, 438, 67 S.Ct. 1283, 1286, 91 L.Ed. 1585; it is enough that the individual activity when multiplied into a general practice is subject to federal control, Wickard v. Filburn, supra [317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122], *or that it contains a threat to the interstate economy that requires preventive regulation.*[17]

(C) *The Meaning of "Unreasonable" and "Substantial":*

What precedes calls for a further inquiry into what is or what is not unreasonable restraint and what is or what is not a substantial lessening of competition.

The words "reasonable" or "unreasonable" do not occur in the Sherman Anti-Trust Act.[17] They were read into the Act by the decisions of the Supreme Court.[18]

The phrases which forbid practices which result in substantial lessening of competition or monopoly occur in the Clayton Act.[19]

All these terms have a pragmatic content. The Courts, in applying them, have sought to evolve concrete criteria by which the effect of a particular practice on competition should be gauged. Their scope and limit was stated by the Court in Fashion Originators' Guild of America v. Federal Trade Commission:

"If the purpose and practice of the combination of garment manufacturers and their affiliates runs counter to the public policy declared in the Sherman and Clayton Acts, the Federal Trade Commission has the power to suppress it as an unfair method of competition. From its findings the Commission concluded that the petitioners, 'pursuant to understandings, arrangements, agreements, combinations and conspiracies entered into jointly and severally', had prevented sales in interstate commerce, had 'substantially lessened, hindered and suppressed' competition, and had tended 'to create in themselves a monopoly.' And paragraph 3 of the Clayton Act 15 U.S.C. A, § 14, declares 'It shall be unlawful for any person engaged in commerce, * * * to * * * make a sale or contract for sale of goods, * * * on the condition, agreement or understanding that the * * * purchaser thereof shall not use or deal in the goods, * * * of a competitor or competitors of the * * * seller, where the effect of such * * * sale, or contract for sale * * * may be to substantially lessen competition or tend to create a monopoly in any line of commerce.' The relevance of this section of the Clayton Act to petitioners' scheme is shown by the fact that the scheme is bottomed upon a system of sale under which (1) textiles shall be sold to garment manufacturers only upon the condition and understanding that *the buyers will not use or deal in textiles which are copied from the designs of textile manufacturing Guild members; (2) garment manufacturers shall sell to retailers only upon the condition and understanding that the retailers shall not use or deal in such copied designs.* And the Federal Trade Commission concluded in the language of the Clayton Act that these understandings substantially lessened competition and tended to create a monopoly. We hold that the Commission, upon adequate and unchallenged findings, correctly concluded that this practice constituted an unfair method of competition.

"Not only does the plan in the respects above discussed thus conflict with the principles of the Clayton Act; the findings of the Commission bring petitioners' combination in its entirety well within the inhibition of the policies declared by the Sherman Act itself. Section 1 of that Act make illegal every contract, combination or con-

---

[17] Mandeville Island Farms, Inc. et al. v. American Crystal Sugar Company, 1948, 68 S.Ct. 996, at page 1006.

[18] Standard Oil Co. v. United States, 1911, 221 U.S. 1, 5, 55–62, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann. Cas.1912D, 734.

[19] 15 U.S.C.A. § 14.

spiracy in restraint of trade or commerce among the several states; Sec. 2 makes illegal every combination or conspiracy which monopolizes or attempts to monopolize any part of that trade or commerce. Under the Sherman Act 'competition not, combination, should be the law of trade.' National Cotton Oil Co. v. Texas, 197 U.S. 115, 129, 25 S.Ct. 379, 381, 382, 49 L.Ed. 689. And among the many respects in which the Guild's plan runs contrary to the policy of the Sherman Act are these: *it narrows the outlets to which garment and textile manufacturers can sell and the sources from retailers can buy.* (Montague & Co. v. Lowry, 193 U.S. 38, 45, 24 S.Ct. 307, 309, 48 L.Ed. 608; Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 48, 49, 33 S. Ct. 9, 14, 15, 57 L.Ed. 107); subjects all retailers and manufacturers who decline to comply with the Guild's program to an organized boycott (Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 609–611, 34 S.Ct. 951, 953, 954, 58 L.Ed. 1490, L.R.A.1915A, 788); takes away the freedom of action of members by requiring each to reveal to the Guild the intimate details of their individual affairs (United States v. American Linseed Oil Co., 262 U.S. 371, 389, 43 S.Ct. 607, 611, 67 L.Ed. 1035); *and has both as its necessary tendency and as its purpose and effect the direct suppression of competition from the sale of unregistered textiles and copied designs* (United States v. American Linseed Oil Co., supra, 262 U.S. at page 389, 43 S.Ct. at page 611, 67 L.Ed. 1035). In addition to all this, the combination is in reality an extra-governmental agency, which prescribed rules for the regulation and re-

straint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations, and thus 'trenches upon the power of the national legislature and violates the statute.' Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 242, 20 S.Ct. 96, 101, 44 L.Ed. 136.

"Nor is it determinative in considering the policy of the Sherman Act that petitioners may not yet have achieved a complete monopoly. For '*it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition*.' United States v. E. C. Knight Co., 156 U.S. 1, 16, 15 S.Ct. 249, 255, 39 L.Ed. 325; Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 237, 20 S.Ct. 96, 105, 44 L.Ed. 136." [20]

The approach to the problem has changed, as later cases indicate.[21] But the test of reasonableness is the same which the court laid down in the first case[22]. As there stated, while the Act defines the boundaries which could not be transgressed, it leaves the application of the standard laid down "to be determined by the light of reason, guided by the principles of law and the duty to apply and enforce the public policy embodied in the statute, in every given case whether any particular act or contract was within the contemplation of the statute." [23]

And the test under the Clayton Act is equally practical. The validity or invalidity of a contract or practice is determined by a consideration of the methods of restraint which the particular contract or practice impose and the effect which they

---

[20] Fashion Originators' Guild of America v. Federal Trade Commission, 1941, 312 U.S. 457, 463–466, 61 S.Ct. 703, 706, 85 L.Ed. 949 (Emphasis added); And see, Eastern States Retail Lumber Dealers' Ass'n v. United States, 1914, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; Standard Fashion Co. v. Magrane–Houston Co., 1922, 258 U.S. 346, 357, 42 S.Ct. 360, 66 L.Ed. 653; Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 489–497, 60 S.Ct. 982, 84 L.Ed. 997.

[21] Federal Trade Commission v. Morton Salt Co., supra; Mandeville Island Farms Co. v. American Crystal Sugar Co., supra.

[22] Standard Oil Co. v. United States,

1911, 221 U.S. 1, 5, 31 S.Ct. 502, 55 L. Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734

[23] Standard Oil Co. v. United States, supra, 221 U.S. at page 64, 31 S.Ct. at page 517, 55 L.Ed. 619, 34 L.R.A.,N.S., 834 Ann.Cas.1912D, 734. And see, Dr. Miles Medical Co. v. John D. Park & Sons Co., 1911, 220 U.S. 373, 406, 407, 31 S.Ct. 376, 55 L.Ed. 502; Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S. Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Boro Hall Corporation v. General Motors, 1942, 2 Cir., 124 F.2d 822; United States v. Aluminum Co. of America, 1945, 2 Cir., 148 F.2d 416, 427–430; United States v. General Motors, 1941, 7 Cir., 121 F.2d 376.

may have.[24] The more recent cases interpret the language of the statute to include not only probable effects but also possible effects.[25]

■ In summary, when we are asked to determine unreasonableness of restraint under the Sherman Act, or substantiality in lessening competition or tendency to create a monopoly in a line of commerce under the Clayton Act, we must envisage the entire situation affected by the practices, and relate it to the object of both statutes, which is to maintain freedom in interstate commerce and trade and to prevent all attempts to monopolize them.[26] At times, courts speak of the "detriment" to the public resulting from a practice.[27] But they do not intend to legalize restraints which *may be* beneficial to the public. As said by Judge Learned Hand: "Be that as it may, that was not the way that Congress chose; it did not condone 'good trusts' and condemn 'bad' ones; it forbade all. Moreover, in so doing it was not necessarily actuated by economic motives alone. It is possible, because of its indirect social or moral effect, to prefer a system of small producers, each dependent for his success upon his own skill and character, to one in which the great mass of those engaged must accept the direction of a few. These considerations which we have suggested only as possible purposes of the Act, we think the decisions prove to have been in fact its purposes. It is settled, at least as to § 1, that there are some contracts restricting competition which are unlawful, *no

matter how beneficient they may be; no industrial exigency will justify them; they are absolutely forbidden*. Chief Justice Taft said as much of contracts dividing a territory among producers, in the often quoted passage of his opinion in the Circuit Court of Appeals in United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 291, 46 L.R.A. 122."[28]

■ The harm to the public is gauged by the effect of the practices on the free flow of goods in interstate commerce and the maintenance of competition in that field. Consequently, practices which are likely to curtail or affect injuriously a measurable or sizeable part of commerce are prohibited under both Acts. As I understand the pleadings, and the Government's position at the beginning of the trial, a judgment is sought decreeing that the clause in the contracts which, by its language and actual effect, as shown by the evidence, restricts the stations not employe-operated to the sale and use of petroleum products and accessories produced or supplied by Standard is illegal per se. We cannot agree. To the contrary, as we read the cases, exclusiveness of outlet is not, in itself, illegal. It becomes illegal only if it result in a substantial lessening of competition or the creation of monopoly in the line of commerce.[29] Indeed, the opinion of the Court in one of the latest cases on the subject indicates clearly that,— to use the language of Mr. Justice Douglas, —"the use of monopoly power, however lawfully acquired, to foreclose competi-

[24] Judson L. Thompson Mfg. Co. v. Federal Trade Commission, 1945, 1 Cir., 150 F.2d 952, 955–958.

[25] Wickard v. Filburn, 1942, 317 U.S. 111, 118–125, 63 S.Ct. 82, 87 L.Ed. 122; Federal Trade Commission v. Morton Salt Co., supra, 68 S.Ct. at pages 828, 829; Mandeville Island Farms, Inc. v. American Crystal Sugar Co., supra, 68 S.Ct. at page 1005–1008; compare Standard Fashion Co. v. Magrane-Houston Co., 1922, 258 U.S. 346, 356, 357, 42 S.Ct. 360, 66 L.Ed. 653; Corn Products Refining Co. v. Federal Trade Commission, 1945, 324 U.S. 726, 738, 65 S.Ct. 961, 89 L.Ed. 1320.

[26] Parker v. Brown, 1943, 317 U.S. 341, 351, 63 S.Ct. 307, 87 L.Ed. 315; United States v. Heating, Piping & Air Conditioning Contractors, 1940, D.C.Cal., 33 F.Supp. 978, 979; United States v. San

Francisco Electrical Contractors' Ass'n, 1944, D.C.Cal., 57 F.Supp. 57, 60.

[27] Standard Oil Co. v. Federal Trade Commission, 1922, 2 Cir., 282 F. 81; Federal Trade Commission v. Sinclair Refining Co., 1923, 261 U.S. 463, 474, 475, 43 S.Ct. 450, 67 L.Ed. 746; International Shoe Company v. Federal Trade Commission, 1930, 280 U.S. 291, 297, 298, 50 S.Ct. 89, 74 L.Ed. 431; United States v. Standard Oil Co. of New Jersey, 1931, D.C.Mo., 47 F.2d 288; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 220, 221, 60 S.Ct. 811, 84 L.Ed. 1129.

[28] United States v. Aluminum Company of America, 1945, 2 Cir., 148 F.2d 416, 427.

[29] Donovan v. Pennsylvania Co., 1905, 199 U.S. 279, 296–302, 26 S.Ct. 91, 50 L.Ed. 192; (cited with approval in Unit-

tion, *to gain a competitive advantage, or to destroy a competitor,* is unlawful." [30]

The phrase "line of commerce" in the Clayton Act is to be given a broad and not a narrow meaning. It should be interpreted, not with relation to a particular outlet, but with relation to the entire "picture",—if one may be permitted to use the best colloquial equivalent to the German word *gestalt* (configuration). So the determination of monopoly in any "line of commerce" cannot be made to rest *solely* on the fact that certain outlets are closed. For, without indulging in a *reductio ad absurdum*, if we say that interfering with *any* outlet is, in itself, a monopoly, we find ourselves in the position of contending that, assuming one controlled station outlet, we have a monopoly as to it. To amplify: It is common knowledge that national merchandising firms like Sears, Roebuck & Company, or Montgomery Ward, own establishments the country over. It is also well known that they control the type of goods which are sold in the branches, which they use as outlets, and which they own. But, assume that they did not own the branches, and that they operated some of them, under one of these various contract arrangements used here,—say a TBA contract. To my mind, it would be unrealistic to contend that, under such circumstances, the control of one or several such outlets would constitute a monopoly. For this reason, I take the words "in any line of commerce" to mean a complete line of activity, not a *small* segment. This interpretation finds support in the following language of the Supreme Court: "The exercise of Congressional power under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, the Clayton Act, 38 Stat. 730, the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., or the National Motor, Vehicle Theft Act, 18 U.S.C.A. § 408, has never been thought to be constitutionally restricted because in any particular case the volume of the commerce affected may be small. *The amount of the commerce regulated is of special significance only to the extent that Congress may be taken to have excluded commerce of small volume from the operation of its regulatory measure by express provision or fair implication."* [31]

We must, therefore, ascertain the *actual* effect of the challenged clause on interstate commerce.

(D) *Intra and Interstate Activities:*

Before doing so, we refer to the contention that the activities of Standard are local in character. Recent cases have obliterated the rigid distinction between intrastate and interstate activities. Activities purely local which interfere with interstate commerce come under the interdiction of the anti-trust statutes.[32] The control of a commodity originating in interstate commerce, although exercised after it comes to rest in a state, does not take it out of the purview of the Sherman or Clayton Acts, if the flow is continuous, and if the restrictions affect it.[33] The latest decisions give effect to the broad definition of commerce contained in one of the older and leading cases on the subect:

"The evidence shows that they and other defendants conspired to burden the free movement of live poultry into the metropolitan area. It may be assumed that some time after delivery of carload lots by interstate carriers to the receivers the movement of the poultry ceases to be interstate commerce. Public Utilities Comm'n v.

---

ed States v. Yellow Cab Co., 1947, 332 U.S. 218, 229, 67 S.Ct. 1560, 91 L.Ed. 2010); Pick Mfg. Co. v. General Motors Corporation, 1936, 299 U.S. 3, 57 S. Ct. 1, 81 L.Ed. 4; Pick Mfg. Co. v. General Motors Corporation, 1935, 7 Cir., 80 F.2d 641; Boro Hall Corporation v. General Motors Corporation, 1942, 2 Cir., 124 F.2d 822; International Salt Co. v. United States, 1947, 330 U.S. 392, 68 S. Ct. 12; United States v. Griffith etc., 68 S.Ct. 941 at page 945.

30 United States v. Griffith, supra, 68 S. Ct. at page 945.

31 National Labor Relations Board v. Fainblatt, 1939, 306 U.S. 601, 606, 59 S.Ct. 668, 671, 83 L.Ed. 1014; and see, Signode Steel Strapping Co. v. Federal Trade Commission, 1942, 4 Cir., 132 F.2d 48, 54.

32 See cases cited in United States v. Heating, Piping & Air Conditioning Contractors' Ass'n, 1940, D.C.Cal., 33 F. Supp. 978, and United States v. San Francisco Electrical Contractors' Ass'n, 1944, D.C.Cal., 57 F.Supp. 57.

33 Mandeville Island Farms Co. v. American Crystal Sugar Co., 1948, 68 S.Ct. at pages 1005, 1006.

Landon, 249 U.S. 236 [237], 245, 39 S.Ct. 268, 63 L.Ed. 577; Missouri v. Kansas Natural Gas Co., 265 U.S. 298, 309, 44 S.Ct. 544, 68 L.Ed. 1027; East Ohio Gas Co. v. Tax Comm., 283 U.S. 465, 470, 471, 51 S. Ct. 499, 75 L.Ed. 1171. But we need not decide when interstate commerce ends and that which is intrastate begins. *The control of the handling, the sales and the prices at the place of origin before the interstate journey begins or in the state of destination where the interstate movement ends may operate directly to restrain and monopolize interstate commerce.*[34]

Without detailing the distributive system used by Standard, it is evident that there is constant interstate flow of the products it produces and distributes. And the interstate origin of the many competitive products, automobile supplies and accessories is also established.[35]

This satisfies fully the requirement of the statutes. For, if the exclusive supply agreements complained of by the Government be unreasonable or monopolistic in effect, they would affect the flow of commerce in several ways: (1) by channeling the products of Standard, regardless of interstate or intrastate source, through an excusive group of outlets; (2) by denying to dealers the right to buy them; and (3) by denying to manufacturers of competitive products the right to sell to the controlled outlets.

Whether they actually have such effect is our final inquiry.

### III.

The Consequences of the Exclusive. Supply Provisions.

(A) The "Appreciable Segment" Test:

In the Associated Press case[36],

the Supreme Court has set out criteria for determining the forbidden character of restrictive outlets under the Sherman Act, which are pertinent to the facts in this case: "The restraint on trade in news here were no less than those held to fall within the ban of the Sherman Act with reference to combinations to restrain trade outlets in the sale of tiles, Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; or enameled ironware, Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 48, 49, 33 S.Ct. 9, 14, 15, 57 L.Ed. 107, or lumber, Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 611, 34 S.Ct. 951, 954, 58 L.Ed. 1490, L.R.A.1915A, 788; or women's clothes, Fashion Originators' Guild v. Federal Trade Commission, supra; or motion pictures, United States v. Crescent Amusement Co., 323 U.S. 173, 65 S.Ct. 254 [89 L.Ed. 650]. Here as in the Fashion Originator's Guild case, supra, 312 U.S. at page 465, 61 S.Ct. at page 707, 85 L.Ed. 949, 'the combination is in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce, and provides extra-judicial tribunals for determination and punishment of violations, and thus "trenches upon the power of the national legislature and violates the statute." Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 242, 20 S.Ct. 96, 107, 44 L.Ed. 136.' By the restrictive By-Laws each of the publishers in the combination has, in effect, 'surrendered himself completely to the control of the association,' Anderson v. Shipowners' Ass'n, 272 U.S. 359, 362, 47 S.Ct. 125, 126, 71 L. Ed. 298, in respect to the disposition of news in interstate commerce. Therefore this contractual restraint of interstate trade, 'designed in the interest of prevent-

---

[34] Local 167 National Brotherhood of Teamsters v. United States, 1934, 291 U.S. 293, 297, 54 S.Ct. 396, 398, 78 L. Ed. 804 (Emphasis added); See, Allen Bradley v. Local Union No. 3, 1945, 325 U.S. 797, 810, 811, 65 S.Ct. 1533, 89 L. Ed. 1939; United Brotherhood of Carpenters v. United States, 1947, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973.

[35] See end of Part I and cases cited in Note 3. See also, United States v. Yellow Cab Co., 1947, 332 U.S. 218, 224–228, 67 S.Ct. 1560, 91 L.Ed. 2010; Mc-

Comb v. Herlihy, 1947, 4 Cir., 161 F.2d 568, 570, 571; see my opinion in Devine v. Joshua Hendy Corporation, 1948, D. C.Calif., 77 F.Supp. 893. And for a comprehensive survey of the recent broadening of the concept of commerce, see, Stern, The Commerce Clause and The National Economy, 1933–1946, 59 Harvard Law Review, 1946, pp. 645, 883.

[36] Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L. Ed. 2013.

ing competition,' cannot be one of the 'normal and usual agreements in aid of trade and commerce which may be found not to be within the [Sherman] Act * * *.' Eastern States Lumber Dealers' Ass'n v. United States supra, 234 U.S. at pages 612, 613, 34 S.Ct. at pages 954, 955, 58 L.Ed. 1490, L.R.A.1915A, 788." [37]

This is anticipatory of the criterion of "appreciable segment" as a test of unreasonableness or monoplistic substantiality, established in later cases.[38]

Some writers have expressed the view that the more recent decisions, and especially the Yellow Cab decision,[39] substitute a new and uniform concept or standard of illegality for the older ones under the Sherman Act, which considers the effect on "an appreciable segment" of commerce the test. They see in this the abandonment of the older, "quantitative" postulate which related the amount of the commerce involved to the whole commerce in the nation.[40] But I find the nucleus of this norm not only in the Associated Press case [41], but in older cases.[42] Thus, in a case involving control of advertising media in a certain field as the basis for a damage action under the Sherman Anti-Trust law, the Supreme Court held that it was invalid, although it applied to a limited geographic area or to a part of the commerce only. The Court used this language: "The record contains no suggestion by respondents or by either court that petitioner's allegations are not sufficient to charge a violation of Secs. 1 and 2. Its right to recover does not depend upon the proportion that respondents control of the total farm

paper advertisements in the entire country, and it was not required to prove that respondents imposed a restraint or attempted monopolization that would affect all commercial advertisements in all farm papers wherever published or circulated. The provisions of Secs. 1 and 2 have both a geographical and distributive significance and apply to any part of the United States as distinguished from the whole and to any part of the classes of things forming a part of interstate commerce. Standard Oil Co. v. United States, 221 U.S. 1, 61, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,(N.S.), 834, Ann.Cas.1912D, 734." [43]

And there is one lower court, well considered decision which found an illegal restriction in a limitation to a particular large customer,—the United States Government.[44]

It was insisted at the oral argument that the late cases, especially the Yellow Cab case [45], having arisen under the Sherman Act, do not control here. Granted that these rulings interpret that Act, they are, nonetheless, applicable to the present case for the obvious reason that the Government in this case charges violations of both the Sherman and Clayton Acts.

▮▮▮▮▮ As a rule, language used in interpreting one statute is not conclusive of the meaning of other kindred statutes. However, the history of Anti-Trust legislation shows that less is required to prove illegality under the Clayton Act than under the Sherman Act. Rightly. For the object of the Clayton Act was to declare illegal, in their incipiency, acts which would only be illegal under the Sherman Act *in*

[37] Associated Press v. United States, supra, 326 U.S. at pages 18, 19, 65 S. Ct. at pages 1423, 1424, 89 L.Ed. 2013.
[38] United States v. Yellow Cab Co., 1947, 332 U.S. 218, 224–228, 67 S.Ct. 1560, 91 L.Ed. 2010.
[39] United States v. Yellow Cab Co., supra, 332 U.S. at page 218, 67 S.Ct. at page 1560, 91 L.Ed. 2010.
[40] See, Zlinkoff & Barnard: The Supreme Court and a Competitive Economy, 1947, 47 Columbia Law Review, pp. 914, 926–932.
[41] Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013.

[42] Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co., 1934, 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356.
[43] Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Publishing Co., supra, 293 U.S. at page 278, 55 S.Ct. at page 185, 79 L.Ed. 356. And see, United States v. Bausch & Lomb Optical Co., 1944, 321 U.S. 707, 720–724, 64 S.Ct. 805, 88 L.Ed. 1024.
[44] United States v. Klearflax Linen Looms, Inc., 1945, D.C.Minn. 63 F.Supp. 32.
[45] United States v. Yellow Cab Co., 1948, 332 U.S. 218, 67 S.Ct. 1560, 91 L. Ed. 2010.

*their full fruition.* Differently put, what, *in its result,* is an unreasonable restraint under the Sherman Act is, *in its beginning,* a substantial restraint under the Clayton Act, *if it is of a nature* likely to achieve such result.

It is argued that to apply this criterion would result in anomalous situations: If the operators of stations, instead of agreeing to buy their "requirements" of petroleum products, agreed to buy a definite quantity over a period of time, sufficient to satisfy their needs, this arrangement would, just as effectively, shut out competition. And yet, it is insisted that, although such arrangement would achieve the same result, it would not fall within any of the prohibitions of the anti-trust statutes.

But there is a distinction between the two situations. When a dealer agrees to take a specific amount of a product, there is a likelihood that *he may,* in case of failure of the supplier to comply with the agreement, or unexpected shortages or increased demands, or a desire to anticipate such shortages or demands, by overstocking,—seek competitive products. There is thus a possibility of access by competitors to the particular outlets.

Under the "requirements" contracts, the chance is completly cut off. Briefly stated, without a "requirements" contract, competitors may, in time, induce dealers to handle their products. With a contract, they never can. There is opportunity to deal with the competitors, and, hence, possibility,—nay, probability, of freedom of action, when there is no restrictive contract. There is complete and final absence of freedom of dealing during the life of a contract, when it calls for exclusion. The shut-out is just as effective as an agreement to boycott products originating in interstate commerce.[46] Both "restrain or control the supply entering and moving in interstate commerce".[47]

(B) Restraint: Entire or Fractional:

(1) Comparative Figures:

The turn which our consideration of the case has taken calls for a statement of additional facts which, in fairness to the defendants, should be referred to, because they are the foundation for the contention that the practices here under attack do not violate either statute. They also serve to point to the fact that, in this case, the problem which confronts the court is to determine, in the light of the latest cases of the Supreme Court, which of the two methods of assaying certain specific facts which, in the main, are not in dispute, should control.

The facts to be alluded to present one facet of the problem. The practices which the Government seeks to prohibit are not of recent origin. To the contrary, they have been in effect for over 15 years. They are employed not only by Standard, but also, as Standard sought to show at the trial,—by its competitors in the Western Area, especially the "majors,"—Associated, Shell, General Petroleum, Texas Co., Union Oil Co., Richfield. Standard introduced, as a part of its defense, the various types of agreement through which the "majors" exercised control over the products sold at stations under contract to them. This, in order to show that the "prevalent practice" achieved exclusive control in one way or another. (Tr. pp. 1768 et seq., 1797 et seq.) The following statistical data, culled from the record, show the comparative position of Standard in relation to its major competitors, omitting, for brevity the comparative number of stations:

---

[46] See, Coronado Coal Co. v. United Mine Workers, 1925, 268 U.S. 295, 310, 45 S.Ct. 551, 69 L.Ed. 963; Bedford Cut Stone Co. v. Journeymen Stone Cutter's Ass'n, 1927, 274 U.S. 37, 49, 47 S. Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Local 167 v. United States, 1934, 291 U. S. 293, 297, 54 S.Ct. 396, 78 L.Ed. 804; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 212–218, 60 S.Ct. 811, 84 L.Ed. 1129; United Brotherhood of Carpenters v. United States, 1947, 330 U.S. 395, 67 S.Ct. 775, 91 L. Ed. 973; and see my opinion in United States v. Heating, Piping & Air Conditioning Contractors' Ass'n, 1940, D.C. Cal., 33 F.Supp. 978.

[47] Coronado Coal Co. v. United Mine Workers, supra, 268 U.S. at page 310, 45 S.Ct. at page 556, 69 L.Ed. 963.

## Gasoline Sales.   (000 gallons)

| State | Year | State Total | Retail Gallonage | | % of Total | |
| | | | S. S. Inc. | Dealers | S. S. Inc. | Dealers |
|---|---|---|---|---|---|---|
| Calif. | 1931 | 1,401,545 | 65,149 | 71,251 | 4.6 | 5.1 |
| | 1946 | 2,640,651 | 209,587 | 135,455 | 7.9 | 5.1 |
| Oregon | 1931 | 170,357 | 4,782 | 25,633 | 2.8 | 15.0 |
| | 1946 | 376,288 | 18,467 | 36,198 | 4.9 | 9.6 |
| Wash. | 1931 | 270,901 | 8,232 | 36,266 | 3.0 | 13.4 |
| | 1946 | 491,301 | 23,021 | 43,606 | 4.7 | 8.9 |
| Ariz. | 1931 | 99,564 | 1,210 | 11,994 | 1.2 | 12.0 |
| | 1946 | 170,075 | 11,973 | 16,526 | 7.0 | 9.7 |
| Nev. | 1931 | 22,549 | 303 | 3,576 | 1.3 | 15.9 |
| | 1946 | 55,079 | 3,785 | 8,287 | 6.9 | 15.0 |
| Idaho | 1931 | 59,293 | 150 | 5,396 | 0.3 | 9.1 |
| | 1946 | 143,304 | 2,417 | 14,576 | 1.7 | 10.2 |
| Utah | 1931 | 60,731 | — | 4,114 | — | 6.8 |
| | 1946 | 146,644 | 4,649 | 13,920 | 3.2 | 9.5 |
| 7 Western States | 1931 | 2,084,940 | 79,825 | 158,229 | 3.8 | 7.6 |
| | 1946 | 4,023,342 | 273,899 | 268,568 | 6.8 | 6.7 |

## Tire Replacement Shipments.

| State | Year | State Total | Retail Sales | | % of State Totals | |
| | | | S.S. Inc. | Dealers | S.S. Inc. | Dealers |
|---|---|---|---|---|---|---|
| Calif. | 1933 | 2,706,750 | 94,366 | 3,441 | 3.5 | .1 |
| | 1946 | 5,985,786 | 130,079 | 79,502 | 2.2 | 1.3 |
| Oregon | 1933 | 328,189 | 14,426 | 1,041 | 4.4 | .3 |
| | 1946 | 890,664 | 13,237 | 29,073 | 1.5 | 3.4 |
| Wash. | 1933 | 588,141 | 15,750 | 2,557 | 2.7 | .4 |
| | 1946 | 1,244,310 | 14,296 | 30,688 | 1.1 | 2.5 |
| Ariz. | 1933 | 123,477 | 6,220 | 4,538 | 5.0 | 3.7 |
| | 1946 | 307,803 | 10,060 | 16,152 | 3.3 | 5.2 |
| Nevada | 1933 | 38,993 | 1,059 | 1,442 | 2.7 | 3.7 |
| | 1946 | 98,235 | 3,000 | 4,307 | 3.1 | 4.4 |
| Idaho | 1933 | 133,225 | 397 | 11 | .3 | .0 |
| | 1946 | 327,450 | 2,294 | 9,511 | .7 | 2.9 |
| Utah | 1933 | 136,475 | 132 | 21 | .1 | .0 |
| | 1946 | 327,450 | 3,530 | 10,229 | 1.1 | 3.1 |
| Seven Western States | 1933 | 4,055,250 | 132,350 | 10,523 | 3.3 | .3 |
| | 1946 | 9,181,698 | 176,496 | 179,462 | 1.9 | 2.0 |

Replacement Battery Sales.

| State | Year | State Total | Retail Sales | | % of State Totals | |
|-------|------|-------------|-------------|---------|-------------------|--------|
| | | | S.S. Inc. | Dealers | S.S. Inc. | Dealers |
| Calif. | 1933 | 718,108 | 17,670 | 58 | 2.5 | — |
| | 1946 | 1,601,511 | 51,328 | 21,281 | 3.2 | 1.3 |
| Oregon | 1933 | 87,070 | 1,455 | 17 | 1.7 | — |
| | 1946 | 238,299 | 4,376 | 5,083 | 1.8 | 2.1 |
| Wash. | 1933 | 156,036 | 2,240 | 42 | 1.4 | — |
| | 1946 | 332,918 | 6,042 | 7,366 | 1.8 | 2.2 |
| Ariz. | 1933 | 32,759 | 806 | 33 | 2.5 | 0.1 |
| | 1946 | 82,353 | 3,542 | 3,877 | 4.3 | 4.7 |
| Nevada | 1933 | 10,345 | 134 | 24 | 1.3 | 0.2 |
| | 1946 | 26,283 | 1,459 | 1,120 | 5.6 | 4.3 |
| Idaho | 1933 | 35,345 | 68 | — | 0.2 | — |
| | 1946 | 87,610 | 1,042 | 2,369 | 1.2 | 2.7 |
| Utah | 1933 | 36,207 | 22 | — | 0.1 | — |
| | 1946 | 87,610 | 1,667 | 1,982 | 1.9 | 2.3 |
| Seven Western States | 1933 | 1,075,870 | 22,395 | 174 | 2.1 | — |
| | 1946 | 2,456,584 | 69,456 | 43,078 | 2.8 | 1.8 |

Certain general inferences were drawn from these facts, at the argument. They are: The actual increase in the sale of petroleum products corresponds to the rise in the whole industry. The number of outlets over a period of ten years has been reduced from an average of 7,650 to 6,000. Between 1936 and 1946, Standard sales of gasoline increased 58.8 per cent. The industry increase for the same period was 64.7 per cent. For lubricating oil, Standard's increase was 62.9 per cent, the industry increase, 104.8 per cent. As to batteries, the increase in units for Standard was 46.5 per cent, for the industry, 41.8 per cent. The comparative figures, as to the increase for some of the other companies are: *Gasoline:* Union Oil Company, 90 per cent; General Petroleum, 165 per cent; and Tidewater Associated, 34 per cent. *Lubricating Oil:* Union Oil Company, 98.2 per cent; General Petroleum, 174.9 per cent; and Tidewater Associated, 54.8 per cent.

Macmillan dispense their lubricating oil through some 10,000 accounts in the seven Western states. For Pennzoil Company, the outlets in 1916 were 2,000, in 1946, 12,000. For Arthur Haven Company, the outlets were 3,500 in 1946, in 1947, 7,000. During this period, the number of outlets for Standard was 5,197. During the same period, the number of independent stations which handle gasoline of different companies, or, what has been referred to as "split pump" accounts, has increased, although they represent only 1.6 per cent of all the stations. Between 1931 and 1941,—a ten-year period,—Standard constructed only 8 per cent of the newly constructed service stations upon vacant sites. Between 1942 and 1947, Standard's proportion of new construction was 8.7 per cent.

(2) The Other Side of the Shield:

The other aspect of the problem must take into consideration the following facts: The gallonage of gasoline marketed has risen and the value of the commerce in petroleum and other products was $68,000,000 in 1947. The following statistical data bear on the extent of this commerce.

Total Gross Quantities of Gasoline Shipped from Standard Oil Company of
California Refineries (Richmond, El Segundo and Bakersfield).
(42 gallon barrels)

| Year | Calif. | Ariz. | Nevada | Oregon | Wash. | Utah | Idaho |
|------|--------|-------|--------|--------|-------|------|-------|
| 1946 | 15,371,753 | 698,933 | 391,715 | 3,289,260 | 3,827,403 | 45,351 | 2,254 |
| 1947 | 18,106,788 | 931,199 | 418,062 | 3,707,282 | 3,161,576 | 36,551 | 920 |

Note: Gasoline shipped above is in general delivered to Company's storage. Require-
ments of all classes of trade are filled from such storage, and the Company has
no records which would show what part of the above gasoline was received for
distribution or sale to retail outlets.

\* \* \* \* \* \* \* \* \* \* \* \* \*

Total Gross Quantities of Automotive Lubricating Oil Sold by Standard
Oil Company of California and Standard Stations, Inc. Such Oils were
Shipped from Richmond and El Segundo Refineries (42 Gal. Barrels)

| Year | Calif. | Ariz. | Nevada | Oregon | Wash. | Utah | Idaho |
|------|--------|-------|--------|--------|-------|------|-------|
| 1946 | 492,226 | 27,012 | 9,569 | 63,525 | 79,982 | 17,016 | 14,177 |
| 1947 | 570,012 | 26,549 | 9,503 | 62,002 | 81,153 | 18,665 | 14,955 |

Note: Company records are not kept showing shipments by state of destination.
Above represents sales by States—export sales are not shown.

Total Gross Quantities of Gasoline Purchased or Acquired by Standard
Oil Company of California (Other Than from Its Own
California Refineries). (42 gallon barrels)

| | Calif. | Ariz. | Nev. | Ore. | Wash. | Utah | Idaho | N.M. | Texas |
|--|--------|-------|------|------|-------|------|-------|------|-------|
| **1946** | | | | | | | | | |
| State from which shipped | — | — | — | — | — | 639,458 | — | 4,032 | 233,570 |
| State of destination | — | 237,602 | — | — | — | 471,735 | 168,083 | — | — |
| **1947** | | | | | | | | | |
| State from which shipped | — | — | — | — | — | 829,189 | — | 13,368 | 101,307 |
| State of destination | — | 114,675 | — | — | — | 630,146 | 199,043 | — | — |

Note: Gasoline received above is in general delivered to Company Storage. Require-
ments of all classes of trade are filled from such storage, and the Company
has no records which would show what part of the above gasoline was re-
ceived for distribution or sale to retail outlets.

Note: The above gasoline was acquired by purchase.

\* \* \* \* \* \* \* \* \* \* \* \* \*

Total Gross Quantities of Gasoline Sold by Standard Oil Company of
California to Retail Dealers—(42 Gallon barrels).

| Year | Calif. | Ariz. | Nev. | Oregon | Wash. | Utah | Idaho |
|------|--------|-------|------|--------|-------|------|-------|
| 1946 | 3,225,122 | 393,467 | 197,310 | 861,865 | 1,038,245 | 331,431 | 347,054 |
| 1947 | 3,937,558 | 431,385 | 223,973 | 1,040,264 | 1,233,551 | 365,244 | 393,200 |

\* \* \* \* \* \* \* \* \* \* \* \*

Total Gross Quantities of Automotive Lubricating Oils Sold by Standard
Oil Company of California to Retail Dealers.)  (42 gallon barrels)

| 1946 | 72,928 | 8,871 | 4,450 | 19,475 | 23,448 | 7,469 | 7,830 |
| 1947 | 77,128 | 8,432 | 4,373 | 20,342 | 24,148 | 7,134 | 7,686 |

Total Gross Quantities of Gasoline Sold at Retail Outlets Operated by
Standard Oil Company of California (Standard
Stations, Inc.) (42 Gallon Barrels).

| Year | Calif. | Arizona | Nevada | Oregon | Wash. | Utah | Idaho |
|------|--------|---------|--------|--------|-------|------|-------|
| 1946 | 4,990,166 | 285,078 | 90,125 | 439,695 | 548,110 | 110,693 | 57,548 |
| 1947 | 5,343,888 | 293,355 | 112,179 | 502,070 | 604,133 | 121,109 | 67,200 |

Total Gross Quantities of Automotive Lubricating Oils Sold at Retail
Outlets Operated by Standard Oil Company of California
(Standard Stations, Inc.) (42 Gallon Barrels).

| 1946 | 80,064 | 5,836 | 1,796 | 8,213 | 10,458 | 2,317 | 1,272 |
| 1947 | 77,265 | 5,210 | 1,969 | 8,311 | 10,380 | 2,259 | 1,369 |

Total Number of Tires, Tubes, Batteries and Other Automotive Accessories Shipped by Companies Manufacturing or Supplying the Same to Standard Oil Company of California and/or Standard Stations, Inc., or to Others On the Order of Standard Oil Company of California and/or Standard Stations, Inc., from States Outside of California, Oregon, Washington, Arizona, Nevada, Idaho, and Utah.

1946

| State into which shipped | Tires | Tubes | Batteries |
|--------------------------|-------|-------|-----------|
| California | — | 19,998 | 4,950 |
| Oregon | — | — | — |
| Washington | — | — | — |
| Arizona | — | — | — |
| Nevada | — | — | — |
| Utah | — | — | — |
| Idaho | — | — | — |
| Total | — | 19,998 (1) | 4,950 (2) |

1947

| State into which shipped | Tires | Tubes | Batteries |
|--------------------------|-------|-------|-----------|
| California | 31,158 | — | 1,692 (3) (4) |
| Oregon | 8,459 | 5,004 | 800 (4) |
| Washington | 10,226 | — | — |
| Arizona | 3,969 | — | 1,268 (3) |
| Nevada | — | — | — |
| Utah | 3,509 | — | 879 |
| Idaho | — | — | — |
| Total | 57,321 (5) | 5,004 (1) | 4,639 |

Note: Source: (1) Alabama; (2) Pennsylvania; (3) Texas; (4) Oklahoma; (5)
Michigan

(3) The Inconclusiveness of Comparative Figures:

Over the Government's objection, I allowed many comparative statistics, of which the foregoing are examples, to go into the record. This was consistent with the view that in resolving the issues of this case, the potential or actual effect of the agreements is important in determining unreasonableness of restraint under the Sherman Act and substantiality of restraint or tendency to create monopoly under the Clayton Act.

■■■ But, while the comparative figures bear on the question, they are not determinate. Substantiality of restraint or tendency to create monopoly is established by (a) the market foreclosed,—here represented by the controlled units,—and (b) the volume of controlled business, totalling here in value $68,000,000.

Fractionally speaking, the business done by the competitors with their own outlets or with those under contract is much greater than the business of Standard,—both in volume and in money value. Nevertheless, the business of Standard is considerable. In effect, it amounts to a substantial lessening of competition and a monopoly of a sizeable segment of a line of commerce in a definite area—the seven Western states. What has *the tendency* to achieve such result becomes, *in actual effect,* an unreasonable restraint. Even before adopting the "appreciable segment" test [48], the Supreme Court sought to avoid a rigid formula for finding reasonableness or unreasonableness. In the Trenton Potteries case, Mr. Justice Stone stated: "Reasonableness is not a concept of definite and unchanging content. Its meaning necessarily varies in the different fields of the law, because it is used as a convenient summary of the dominant considerations which control in the application of legal doctrines. Our view of what is a reasonable restraint of commerce is controlled by the recognized purpose of the Sherman Law itself. Whether this type of restraint is reasonable or not must be judged in part at least, in the light of its effect on competition, for, whatever difference of opinion there may be among economists as to the social and economic desirability of an unrestrained competitive system, it cannot be doubted that the Sherman Law and the judicial decisions interpreting it *are based upon the assumption that the public interest is best protected from the evils of monopoly * * * by the maintenance of competition."* [49] It follows that there is illegal restraint here under both Acts, whether the commerce be considered quantitatively or comparatively.

(4) Application to Sub-leases and Open Accounts.

■■■ We need not dwell at length on the contention that the stations operated under a sub-lease or on open account must be omitted from consideration. It is true that the Clayton Act [50] speaks of leases of goods. And it may be conceded that the statute does not apply to leases on real property. And, generally speaking, a sub-lease is not a lease. But, as I stated at the oral argument, the designation which the parties have given to an instrument is not conclusive. We are dealing with an important governmental policy of long duration, established by a statute which became effective on July 2, 1890 [51], and implemented by a subsequent statute, which became effective on October 15, 1914 [52]. Our duty is to give effect to it. If the practices involved in the case are contrary to the provisions of either statute, the character of the instrument in which they are contained is not important. The Sherman Act refers to contracts.[53] The Clayton Act refers to leases, sales or contracts. But, in setting the boundaries of illegality, it speaks of conditions, agreements, or understandings that the lessee or purchaser shall not use or deal in competitive goods, and which may

---

[48] See Part III, (A) and cases cited in Footnotes 36 to 45.

[49] United States v. Trenton Potteries, 1926, 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700, 50 A.L.R. 989. (Emphasis added.)

[50] 15 U.S.C.A. § 14; Curtis Publishing Co. v. Federal Trade Commission, 1921, 3 Cir., 270 F. 881, 906; Associated Oil Co. v. Meyers, 1933, 217 Cal. 297, 304–306, 18 P.2d 668.

[51] 15 U.S.C.A. § 1.

[52] 15 U.S.C.A. § 14.

[53] 15 U.S.C.A. § 1.

result in the restraints condemned by the statute.[54] The Complaint is drawn under both statutes. Ordinarily, a lease deals with the term, the rent to be paid, and the type of business to be conducted on the premises. But, if, in addition, it says whose goods or products should be handled on the premises, we have a condition, agreement or understanding which has nothing to do with the lease proper, and which is within the scope of our inquiry. And if the exclusive supply undertaking, whether contained in a lease, or lurking behind an open account, has the effect condemned by the statute, it is within its prohibitions.[55]

(5) Source of Products.

For the purpose of distributing the petroleum products in bulk, supplied by the California refineries of Standard, the territory is divided into twenty-three distributive areas. These areas are supplied bulk products by tank cars or tank trucks from various points, which, in turn, are supplied by tanker from the refineries.

Package goods are supplied by box cars and package trucks from the various refineries. For this purpose, the territory is divided into four areas. The accessories are supplied from eight accessory warehouses, their location and the dealers they serve being:

San Francisco—serves Central and Northern California; also dealers in Northwestern Nevada; also Lakeview District in Southern Oregon.

Salt Lake City—serves all Utah, Arizona, North of Grand Canyon, Eastern and Northern Nevada and Southeastern Idaho.

Phoenix—confined to the State of Arizona and Needles across the Colorado River in California.

Los Angeles—Southern California and Southern Nevada.

Fresno—within the State of California.

Portland—Oregon, Southern Washington and Southwestern Idaho.

Seattle—Washington only.

Spokane — Eastern Washington and Northern Idaho.

The point is pressed that some of the products, such as gasoline, are supplied to California stations exclusively from California refineries. And it is argued that, so far as the California stations are concerned, their dealings in gasoline are beyond the purview of interstate commerce.

■■■ We are not dealing here with commerce in different articles. We are dealing with contracts and practices which are alleged to be illegal under the Anti-Trust Acts. These contracts, which have been epitomized in the first part of this opinion[56], cover *specifically* all petroleum products and tires, tubes and batteries. They also affect dealings in other accessories. We need not, therefore,—nay, we cannot,—make a segregation, so as to exclude any item which may have both state provenance and destination in the Western area. The contract is an entirety and cannot be split. More, under the Clayton Act, if a contract has a tendency to lessen competition substantially, or to create a monopoly, the fact that it may also affect the movement of goods in intrastate commerce does not validate it, if its whole effect is likely to be a lessening of competition or monopoly in a sizeable and measurable segment of interstate commerce. In interpreting statutes of this character, and, generally, any legislation which aims to carry into effect the plenary power of the Congress to regulate commerce, it is accepted constitutional doctrine that the power to control is not destroyed by the mere fact that purely intrastate activities may also be reached by it.[57]

---

[54] 15 U.S.C.A. § 14.

[55] See, United Shoe Machinery Corporation v. United States, 1922, 258 U.S. 451, 457, 458, 42 S.Ct. 363, 66 L. Ed. 708; Standard Fashion Co. v. Magrane-Houston Co., 1922, 258 U.S. 346, 354, 355, 42 S.Ct. 360, 66 L.Ed. 653.

[56] See Part I of Opinion.

[57] See Part II–(D), and cases cited in Footnotes 32 to 35. And see, United States v. Wrightwood Dairy Co., 1942, 315 U.S. 110, 62 S.Ct. 523, 86 L. Ed. 726; Illinois Natural Gas Co. v. Central Illinois Public Service Co., 1942, 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371; and see my opinion in Holl v. Southern Pac. Co., 1947, D.C.Cal., 71 F.Supp. 21, 23, 24.

874

More, as already shown, there is a constant flow in interstate commerce of these products and supplies.[58] The contracts affect, and the transactions under them are in the course of, interstate commerce. And the practice must also be considered from the effect on the dealers and the competitive suppliers. If, as to them, it results in an effective lock-out of a considerable supply of goods of interstate source, the contracts which carry the practice into effect are invalid.

## V.

### Conclusion and Findings.

#### (1) Summary of Conclusions:

So we come to the end of our discussion. Grant that, on a comparative basis, and in relation to the entire trade in these products in the area, the restraint is not integral. Admit also that control of distribution results in lessening of costs and that its abandonment might increase costs. Despite all this, there confronts us the inescapable fact that such "balanced distribution"—as counsel for the defendants characterize it,—calls for concentration of representation, which, in turn, results in an unreasonable restriction of trade, and a substantial lessening of competition, so far as the 5197 outlets, their independent operators and those who seek to supply them, are concerned. As the restriction corners a market of the value of $68,000,000, it is illegal, even considered on a comparative basis. Concede further, that the arrangement was entered into in good faith, with the honest belief that control of distribution and consequent concentration of representation were economically beneficial[59]

[58] United States v. Trenton Potteries, 1926, 273 U.S. 392, 397, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989; and see cases cited in Footnotes 9 to 13. General statements on discontinuity as an element in fixing the intrastate character of a transaction, such as those quoted and relied on, from Jewel Tea Co. v. Williams, 1941, 10 Cir., 118 F.2d 202, 203, 206, 207, are not very helpful. They must be evaluated only in relation to the situation under review in the particular case, and in the light of the later Supreme Court decisions, which have modified greatly the concept they seek to perpetuate. The case in which they are found was decided *in 1941*. In Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 335, 87 L.Ed. 460, *decided in 1944*, the Supreme Court refused to apply rigidly the formula of pause or stoppage. The Court said: "The record reveals, however, that the goods in both of these two categories are ordered pursuant to a pre-existing contract or understanding with the customer. It is not clear whether the decision of the Circuit Court of Appeals includes these two types of transactions in the group of prior orders which it held were covered by the Act. We think they must be included. Certainly they cannot be distinguished from the special orders which respondent receives from its customers. Here also, *a break in their physical continuity of transit is not controlling. If there is a practical continuity of movement from the manufacturers or suppliers without the state, through respondent's warehouse and on to customers whose prior orders or contracts are being filled, the interstate journey is not ended by reason of a temporary holding of the goods at the warehouse. The fact that respondent may treat the goods as stock in trade or the circumstance that title to the goods passes to respondent on the intermediate delivery does not mean that the interstate journey ends at the warehouse.* The contract or understanding pursuant to which goods are ordered, like a special order, indicates where it was intended that the interstate movement should terminate. Numerous authorities are pressed on us for the contrary view and for the conclusion that when the goods enter the warehouse, they are no longer 'in commerce'. But as we stated in Kirschbaum Co. v. Walling, 316 U.S. 517, 520, 521, 62 S.Ct. 1116, 1118, 1119, 86 L.Ed. 1638, decisions dealing with various assertions of state or federal power in the commerce filed are not particularly helpful in determining the reach of this Act." (Walling v. Jacksonville Paper Co., supra, 317 U.S. at pages 568–569, 63 S.Ct. at pages 335, 336, 87 L.Ed. 460) (Emphasis added.)

And see, Walling v. Mutual Wholesale Food & Supply Co., 1944, 8 Cir., 141 F.2d 331, 338–340; compare, Clyde v. Broderick, 1944, 10 Cir., 144 F.2d 348, 351, *decided after* the Jacksonville Paper Co. case, and in which *the same court* which decided the Jewel Tea Company case applies a more flexible concept, which accords with the latest rulings of the Supreme Court.

[59] See Part II–(D) of opinion, and cases cited in Footnotes 32 to 35.

to the industry and to the public, that they have continued for over fifteen years openly, notoriously and unmolested by the Government, and have been practiced by other major oil companies competing with Standard, that the number of Standard outlets so controlled may have decreased, and the quantity of products supplied to them may have declined, on a comparative basis. Nevertheless, as I read the latest cases of the Supreme Court, I am compelled to find the practices here involved to be violative of both statutes. For they affect injuriously a sizeable part of interstate commerce, or,—to use the current phrase,—"an appreciable segment" of interstate commerce.

(2) Specific Findings:

So the facts proved and the legal principles applicable command the following findings:

1. The exclusive supply agreements relate to interstate commerce.

2. They affect, and the transactions under them are, in the course of, interstate commerce.

3. The relation established by the agreements between the operators and Standard is not that of employer and employee, but that of independent contractor.

4. The agreements confine the operators of stations to which they apply to dealing in Standard products, and automotive accessories handled or sponsored by them.

5. They lock out dealers from sources of competitive products originating in interstate commerce.

6. They deny to dealers access to such competitive products.

7. They deny to manufacturers or suppliers of such products access to the outlets controlled by the independent contractors who operate the stations.

8. They affect a substantial number of outlets and a substantial amount of products, whether considered comparatively or not.

9. They constitute an unreasonable restraint of trade and commerce among the States, under the Sherman Anti-Trust Act.[60]

10. They result in a substantial lessening of competition and tend to create a monopoly in a line of commerce, in contravention of the Clayton Act.[61]

11. They are illegal *in their effect* and should be enjoined.

Judgment will, therefore, be for the plaintiff. The terms of the judgment are contained in an order filed simultaneously.

(See Appendices A and B, following Supplemental opinion, for complete Findings and Decree)

### Supplemental Opinion

YANKWICH, District Judge.

#### I.

### The Motion to Reconsider.

On the same day on which the opinion in this case was filed, June 7, 1948, the Supreme Court decided United States v. Columbia Steel Company et al., 68 S.Ct. 1107, 1121.[1] On June 16, 1948, the defendants in this case filed a notice of motion for "reopening, reargument and reconsideration". This was followed by the motion itself, which, originally noticed for June 28, 1948, was advanced to, and actually made, on June 24, 1948, and submitted. It seeks a decision, findings and judgment in favor of the defendants.

I doubt if a motion of this character, which is akin to the motion for "another and different judgment" under California practice[2], can be entertained in our court, either before or after formal findings and judgment are filed. However, neither in the case in which I expressed such doubt[3], nor in a more recent case in which a similar motion was made[4], did I

---

[60] 15 U.S.C.A. § 1.

[61] 15 U.S.C.A. § 14.

[1] United States v. Columbia Steel Company, et al., No. 461, October Term.

[2] California Code of Civil Procedure, Sec. 663.

[3] Brooks Bros. v. Brooks Clothing Co. of California, 1945, D.C.Calif., 5 F.R.D. 14.

[4] Blanchard v. Pinkerton, 77 F.Supp. 861.

allow this to stand in the way of determining the motion on the merits. Nor will I do so in this case. For I grant that a judge may, at any time before finality attaches to his decision, change his views on the law of a case or the conclusions to be reached as to a controversy or a specific phase of it [5]. More, it would be the imperative duty of any judge of a lower court to give effect to a decision of the highest court of the land, announced subsequent to, or simultaneously with, his decision, and which called for a modification of his views. And such action would be obligatory, whether the higher court spoke with unanimity or was divided, or even if the judge agreed with the minority opinion. When such a situation confronted me several years ago, I wrote [21 F.Supp. 135]: "I feel compelled by this decision to hold that the new enactment, Chapter 10, of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., in so far as it applies to irrigation districts of the type of the petitioner, is constitutionally vulnerable, as was the old. As a student, exercising private judgment, I agree with the conclusion of the dissenters that immunity from interference through federal bankruptcy laws, even if applicable to states, should not be extended to state instrumentalities, whether they be municipal, quasi-municipal or public corporations. *However, as a judge of a lower court, I cannot exercise private judgment, but must follow the opinion of the majority, which, as I read it, extends the immunity to all governmental agencies created by a state for the performance of public functions.*" [6]

Counsel for the defendants who are, no doubt, familiar with our practice in this respect, have assumed that I would hear the motion on the merits. For, in addition to referring to cases which recognize the right of a court to reconsider its decision [7],

they filed simultaneously a twenty-page printed memorandum, the aim of which is to show "that the decision of the Supreme Court in United States v. Columbia Steel Company, requires a decision in favor of the defendants."

Hence the notice, the brief and the motion itself, which is now before me for decision, all call for a determination of the question propounded by the defendants whether the decision referred to commands a ruling in the present case in favor of the defendants.

## II.

### The Scope of United States v. Columbia Steel Co.

I am of the view that it does not call for a different conclusion than that announced on June 7, 1948. At the outset, I advert to the fact that the range of the ruling I made is not to be determined by the arguments which the Government advanced, *but by what was actually decided.* The fact that in the Columbia Steel Company case the Government may have made arguments similar to those made in this case loses all significance, if, *in fact,* my ruling was contrary to the contention. To illustrate: The Government, in the present case, contended that the exclusive supply provision in the Standard contracts was illegal per se. I declined to so hold. On the contrary, I ruled that it was illegal *only if it resulted in an unreasonable restraint under the Sherman Act or in substantial lessening of* competition under the Clayton Act.[8] I wrote: "As I understand the pleadings, and the Government's position at the beginning of the trial, a judgment is sought decreeing that the clause in the contracts which, by its language and actual effect, as shown by the evidence, restricts the stations not employe-operated to the

[5] See, G. Amsinck & Co., Inc. v. Springfield Grocer Co., 1925, 8 Cir., 7 F.2d 855, 857, 858; Continental Nat. Bank v. National City Bank, 1934, 9 Cir., 69 F.2d 312, 317, 318. While the cases just cited arose prior to the effective date of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, the right of a court to change its conclusions before final judgment is recognized in cases decided since the rules went into effect. See, Marconi Wireless Co. v. United States, 1943, 320 U.S. 1, 47, 48, 63 S.Ct. 1393, 87 L.Ed. 1731.

[6] In re Lindsay-Strathmore Irrigation District, 1937, D.C.Cal., 21 F.Supp. 129, 135. Emphasis added.

[7] See cases in Footnote No. 5.

[8] See 78 F.Supp. 857 to 864.

sale and use of petroleum products and accessories produced or supplied by Standard is illegal per se. We cannot agree. To the contrary, as we read the cases, exclusiveness of outlet is not, in itself, illegal. It becomes illegal only if it result in a substantial lessening of competition or the creation of monopoly in the line of commerce." [9]

The Supreme Court in the Columbia Steel Co. case, interprets its own prior decisions, and especially the Yellow Cab decision [10], in the same manner. Mr. Justice Reed, after referring to the Government's contention that such contracts are illegal per se, says: "We do not construe our holding in the Yellow Cab case to make illegal the acquisition by United States Steel of this outlet for its rolled steel without consideration of its effect on the opportunities of other competitor producers to market their rolled steel. In discussing the charge in the Yellow Cab case, we said that the fact that the conspirators were integrated did not insulate them from the act, not that corporate integration violated the act. In the complaint the government charged that the defendants had combined and conspired to effect the restraints in question with the intent and purpose of monopolizing the cab business in certain cities, and on motion to dismiss that allegation was accepted as true. Where a complaint charges such an unreasonable restraint as the facts of the Yellow Cab case show, the amount of interstate trade affected is immaterial in determining whether a violation of the Sherman Act has been charged." [11]

And even the adoption of the Government's contention by a lower court in one case and its rejection in another by a higher court does not, *necessarily*, mean that *the facts in both cases call for the same decision.*

## III.

### The Grounds of the Columbia Steel Co. Decision

Unlike the present case which charged violation of *both* the Sherman and Clayton Acts, the Columbia Steel Co. case charged violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, only. The narrow scope of the inquiry in that case appears from this brief statement of the issues with which the opinion begins: "The United States brings this suit under Sec. 4 of the Sherman Act, 15 U.S.C.A. § 4, to enjoin United States Steel Corporation and its subsidiaries from purchasing the assets of the largest independent steel fabricator on the West Coast on the ground that such acquisition would violate §§ 1 and 2 of the Sherman Act. The Complaint, filed on February 24, 1947, charged that if the contract of sale between United States Steel and Consolidated Steel Corporation were carried out, competition in the sale of rolled steel products and in fabricated steel products would be restrained, and that the contract indicated an effort on the part of United States Steel to attempt to monopolize the market in fabricated steel products. After a trial before a since judge in the district court, judgment was entered in favor of the defendants, and the government brought the case here by direct appeal. 32 Stat. 823, 15 U.S.C. § 29, 15 U.S.C.A. § 29." [12]

The position of the Government in the case was weakened by the fact that on June 17, 1946, the Attorney General of the United States had approved the sale by the War Assets Administration to the United States Steel Corporation, one of the defendants, of the plant which the Government had constructed, during the war, at Geneva, Utah. The negotiations for the sale of the Consolidated plant began prior to that sale. And the purpose of the Consolidated pur-

[9] See 78 F.Supp. 863.

[10] United States v. Yellow Cab Co., 1947, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010.

[11] United States v. Columbia Steel Co., et al., 68 S.Ct. at page 1121. It is to be observed that Mr. Justice Reed in Footnote No. 17 of the Opinion quotes a portion of the Yellow Cab opinion which lays

stress on the effect of a restraint on commerce in a given area, and which adopts the language in Indiana Farmers Guide Pub. Co. v. Prairie Farmer Pub. Co., 1934, 293 U.S. 268, 279, 55 S.Ct. 182, 79 L.Ed. 356, which I stressed in the opinion.

[12] United States v. Columbia Steel Co., 68 S.Ct. at page 3.

chase was, as stated in the opinion, with evident approval: "to assure a market for plates and shapes produced at Geneva, and Roach testified that Consolidated's purpose was to withdraw the stockholders' equity from the fabrication business with it cyclical fluctuations at a time when a favorable price could be realized." [13]

In effect, the court rules that Consolidated's acquisition would not have any great effect on the market, in view of the fact that its requirements are "an insignificant fraction of the total market,—less than ½ of 1%." [14]

The court was also unable to foresee the probability of the continuance of even that limited market if the sale is not completed. Mr. Justice Reed said: "Whether we accept the government's or Consolidated's figures, however, they are of little value in determining the extent to which West Coast fabricators will purchase rolled steel products in the eastern market in the future, since the construction of new plants at Geneva and Fontana and the creation of new basing points on the West Coast presumably give West Coast rolled steel producers a far larger share of the West Coast fabricating market than before the war." [15]

And, finally, the court stressed the fact that the future dealings between Consolidated and United States Steel would be mere incidents of ownership, not illegal per se, and would not transgress the provisions of the Sherman Act. As Mr. Justice Reed put it:

"A subsidiary will in all probability deal only with its parent for goods the parent can furnish. *That fact, however, does not make the acquisition invalid.* When other elements of Sherman Act violations are present, the fact of corporate relationship is material and can be considered in the determination of whether restraint or attempt to restrain exists. That this is the teaching of the Yellow Cab case is indicated by the following quotation:

" 'And so in this case, the common ownership and control of the various corporate appellees are impotent to liberate the alleged combination and conspiracy from the impact of the Act. The complaint charges that the restraint of interstate trade was not only effected by the combination of the appellees but was the primary object of the combination. The theory of the complaint, to borrow language from United States v. Reading Co., 253 U.S. 26, 57, 40 S.Ct. 425, 432, 64 L.Ed. 760, is that "dominating power" over the cab operating companies "was not obtained by normal expansion to meet the demands of a business growing as a result of superior and enterprising management, but by deliberate, calculated purchase for control". If that theory is borne out in this case by the evidence, coupled with proof of an undue restraint of interstate trade, a plain violation of the Act has occurred.' That view is in accordance with previous decisions of the Court.

*"The legality of the acquisition by United States Steel of a market outlet for its rolled steel through the purchase of the manufacturing facilities of Consolidated depends not merely upon the fact of that acquired control but also upon many other factors. Exclusive dealings for rolled steel between Consolidated and United States Steel, brought about by vertical integration or otherwise, are not illegal, at any rate until the effect of such control is to unreasonably restrict the opportunities of competitors to market their product."* [16]

The position of the Court was summed up in this language: "We conclude that the so-called vertical integration resulting from the acquisition of Consolidated *does not unreasonably restrict the opportunities of the competitor producers of rolled steel to market their product.* We accept as the relevant competitive market the total demand for rolled steel products in the eleven-state area; over the past ten years Consolidated has accounted for only 3% of that demand, and if expectations as to the development of the western steel industry are realized, Consolidated's proportion may be expected to be lower than that figure in the future. *Nor can we find a specific intent* in the present case to accomplish an unrea-

---

[13] 68 S.Ct. at pages 1113, 1114.
[14] 68 S.Ct. at page 1114.
[15] 68 S.Ct. at pages 1115, 1116.

[16] 68 S.Ct. at page 1122. Emphasis added.

sonable restraint, for reasons which we discuss under heading III of this opinion." [17]

So, on the whole, it is evident that the decision in Columbia Steel Co. case cannot be given the broad scope which the defendants claim for it. *It is canalized in the narrow channel which the facts in the case established*. The court did not have before it any established facts from which to determine the effect which such acquisition might have on future dealings with the acquired company in certain steel products. And there being no probability of restraining effect on interstate commerce, the court found no violation of the Sherman Act.

The minority opinion lends support to this view of the case. The majority declined to see violation in size resulting from permissible concentration of ownership. They required deleterious effects on commerce, in addition, before refusing sanction to the purchase. These they could not find or foresee. The minority, on the contrary, would have found violation in mere bigness.[18]

In the present case, as appears from the original opinion, we are dealing *not with probabilities but with actualities*. It was proved at the trial that the challenged practices have, *in fact*, already resulted in denying to the independent operators of stations *which are not owned by the defendants*, free dealing in certain commodities in interstate commerce and locking out Standard's competitors from these outlets. And, as there are no rights incident to ownership, of the type involved in the contemplated purchase of Consolidated Steel, the conclusions already announced must stand. The motion is denied.

## APPENDIX A.

### Findings of Fact.

1. This is a suit in equity by the United States to enjoin certain practices engaged in by the defendants alleged to be in viola-

---

[17] 68 S.Ct. at page 1124. Emphasis added.

[18] The gist of the dissent is contained in this forceful statement: "We have here the problem of bigness. Its lesson should by now have been burned into our memory by Brandeis. *The Curse of Bigness* shows how size can become a menace —both industrial and social. It can be an industrial menace because it creates gross inequalities against existing or putative competitors. It can be a social menace—because of its control of prices. Control of prices in the steel industry is powerful leverage on our economy. For the price of steel determines the price of hundreds of other articles. Our price level determines in large measure whether we have prosperity or depression—an economy of abundance or scarcity. Size in steel should therefore be jealously watched. In final analysis, size in steel is the measure of the power of a handful of men over our economy. That power can be utilized with lightning speed. It can be benign or it can be dangerous. The philosophy of the Sherman Act is that it should not exist. For all power tends to develop into a government in itself. Power that controls the economy should be in the hands of elected representatives of the people, not in the hands of an industrial oligarchy. Industrial power should be decentralized. It should be scattered into many hands so that the fortunes of the people will not be dependent on the whim or caprice, the political prejudices, the emotional stability of a few self-appointed men. The fact that they are not vicious men but respectable and social minded is irrelevant. That is the philosophy and the command of the Sherman Act. It is founded on a theory of hostility to the concentration in private hands of power so great that only a government of the people should have it."

Clearly, the minority, led by Mr. Justice Douglas, would stop large concentrations of ownership because they see in them the possibility of harm to the national economy through price-control and other harmful restrictions to freedom of commerce. The majority, led by Mr. Justice Reed, do not see in consolidation of economic power the unreasonable restraint condemned by the Sherman Act. 15 U.S.C.A. §§ 1 and 2. To them, that Act does not denounce *bigness per se*, but only such control, large or small, as results, in fact, in the restrictive or monopolistic evils at which the anti trust law is aimed.

Here, as is obvious from this and the original opinion, the injurious effect of the restrictions on interstate commerce has been shown to exist. More, the present action charges also violation of the Clayton Act, 15 U.S.C.A. § 14, which aims to stop monopolistic practices in their inception. Under it, a violation can be found if the practices *tend* to achieve the harm condemned by the statute, although such result has not yet been attained.

tion of Section 1 of the Sherman Anti-Trust Act; Act July 2, 1890, 26 Stat. 209, 15 U.S.C.A. § 1, and Section 3 of the Clayton Act, 38 Stat. 731, 15 U.S.C.A. § 14. The Court has jurisdiction of the subject matter and the parties. The defendants Standard Oil Company of California, hereinafter called "Standard," and Standard Stations, Inc., hereinafter called "Standard Stations," have offices, transact business, and are found within the Central Division of the Southern District of California.

2. Defendant Standard is a corporation organized and existing under the laws of the State of Delaware. Standard is engaged in the business of producing and refining petroleum products in the State of California, and of transporting, marketing, and distributing such products in the States of California, Oregon, Washington, Idaho, Nevada, Utah and Arizona. Said states will hereinafter be collectively referred to as the Western area.

3. Defendant Standard Stations is a corporation organized under the laws of the State of Delaware, and is a wholly-owned subsidiary of Standard. It is engaged in the business of managing and operating service stations throughout the Western area for Standard.

4. Defendants Standard and Standard Stations have for many years past and are at the present time leasing, taking title to, and entering into contractual relationships with operators of service station sites for retail outlets within the Western area.

5. Definitions of terms.

A. The term "retail outlet," as used herein, refers to a service station or garage at which petroleum products and/or "automotive accessories" manufactured or "sponsored by" defendants Standard and Standard Stations are sold or distributed to the motoring public by an "independent dealer."

B. The term "independent dealer," as used herein, refers to the operator of a "retail outlet" who operates said retail outlet as an independent business enterprise and not as an employee or agent of defendants Standard or Standard Stations.

C. The term "petroleum products," as used herein, refers to those products obtained or manufactured from natural gases or crude oil by various processes and sold or used as a fuel or lubricant for automotive vehicles, together with miscellaneous oils and compounds derived from natural gases or crude oil and designated for various specific uses and includes such petroleum products as are manufactured or "sponsored by" defendants and sold by defendants "Standard" or "Standard Stations" at any retail outlet operated by said defendants or either of them.

D. The term "automotive accessories," as used herein, refers to replacement parts and articles other than "petroleum products" used on or in the servicing or repairing of automotive vehicles and includes tires, tubes, batteries, spark plugs, oil filters, oil filter cartridges, fan belts, battery cables, auto lamp bulbs, fuses, windshield wipers and blades, tire repair and vulcanizing kits, anti-freeze preparations, tire chains, waxes and polishes and other like items and includes such "automotive accessories" as are manufactured or "sponsored by" defendants and sold by defendants "Standard" or "Standard Stations" at any retail outlet operated by said defendants or either of them.

E. The term "sponsored by," as used herein, refers to petroleum products and/or "automotive accessories" which are not manufactured or produced by defendants Standard and/or "Standard Stations."

6. In or about the year 1926 defendant Standard began to acquire service station sites or "retail outlets" by means of leases or subleases. In or about the year 1927 Standard commenced to sublease certain of said "retail outlets" to "independent dealers." The said subleases required the "independent dealer" to sell only the products of defendant Standard on the leased premises. This method of acquiring control of "retail outlets" for the purpose of distributing and selling its products to the motoring public was termed the "lease and license system." Approximately 1,800 to 2,000 retail outlets were selling Standard's products under this method of distribution by the late 1920's.

7. Beginning in or about 1931 and until approximately the year 1938, the "lease and agency" system was used as a means of dis-

tributing Standard's products. During this period lease and agency agreements were executed and agency agreements without leases were employed. In numerous instances said lease and agency agreements provided that the agent handle only such gasoline, lubricating oils, and other petroleum products as were manufactured or sold by defendant Standard.

8. Beginning about the year 1934 a form of agreement entitled "Distributor's Agreement," substantially similar to Plaintiff's Exhibit No. 2, was used by defendants as an additional method of distributing Standard's products through "independent dealers." Under such agreement, the "independent dealer" was required to acquire or purchase his total requirements of "petroleum products" and tires, tubes and batteries, which he sold or acquired for sale at the retail outlet operated by such dealer, from or through defendant Standard. Said written agreement also provided for the acquisition by said dealer from Standard of miscellaneous "automotive accessories."

9. In or about the year 1938 Standard superseded the agency agreements by "Dealer Agreements" substantially similar in form and content to Plaintiff's Exhibit No. 1, hereinafter more fully described in Paragraph 11. In 1944 Standard instituted and put into use within the Western area a form of agreement entitled "Petroleum Products and Equipment Agreement" (Plaintiff's Exhibit No. 3), hereinafter more fully described in Paragraph 13. At about the same time, Standard also instituted and put into use within the Western area a form of agreement entitled "Dealer Agreement TBA" (Plaintiff's Exhibit No. 4). The "Dealer Agreements TBA" have gradually replaced and superseded the Distributor Agreements (Plaintiff's Exhibit No. 2) being used when the latter form of agreement (Plaintiff's Exhibit No. 2) expired. Both the Dealer Agreement TBA form and the Distributor Agreement form contain comparable provisions relating to the purchase from the defendants by an "independent dealer" of his requirements of "petroleum products," tires, tubes, batteries, and miscellaneous "automotive accessories."

10. The relationship between defendants Standard and Standard Stations to an "independent dealer" is governed by five types of written agreements (Plaintiff's Exhibit No. 6) at the present time. Such agreements are designated (1) Dealer Agreements (Plaintiff's Exhibit No. 1); (2) Distributor Agreements (Plaintiff's Exhibit No. 2); (3) Petroleum Products and Equipment Agreement (Plaintiff's Exhibit No. 3); (4) Dealer Agreement TBA (Plaintiff's Exhibit No. 4); (5) Sublease (Plaintiff's Exhibit No. 5).

11. The "Dealer Agreement" (Plaintiff's Exhibit No. 1) contains the following clauses:

"1. Standard Oil Company of California, a corporation, hereinafter called 'Company,' agrees to sell to.............., hereinafter called 'Dealer,' and Dealer agrees to buy from Company, all of Dealer's requirements of petroleum products used or sold or bought to be used or sold by Dealer at............................ The petroleum products to meet Dealer's requirements hereunder shall be those brands of gasoline, lubricating oils, and other petroleum products sold by Company to its dealers generally in Dealer's vicinity."

\*    \*    \*    \*    \*    \*

"7. In the performance of this agreement Dealer is engaged in an independent business and nothing herein contained shall be construed as reserving to Company any right to control Dealer with respect to his conduct in the performance of this agreement. Company reserves no right to exercise any control over any of Dealer's employees and all employees of the Dealer shall be entirely under the control and direction of Dealer who shall be responsible for their actions and omissions. Dealer will, at his own expense, during the term hereof, maintain full insurance under any Workmen's Compensation Laws effective in said state covering all persons employed by and working for him in connection with the performance of this agreement, and upon request shall furnish Company with satisfactory evidence of the maintenance of such insurance. Dealer accepts ex-

clusive liability for all contributions and payroll taxes required under Federal Social Security Laws and State Unemployment Compensation Laws as to all persons employed by and working for him in connection with the performance of this agreement."

\* \* \* \* \* \*

"9. This agreement shall not be assignable without the prior written consent of the Company. The waiver by Company of any default by Dealer shall not be deemed to be a continuing waiver of such default or the waiver of the default of any other provision hereof. This agreement shall, as of the commencement date hereof, terminate all prior Dealer Agreements and Agency Agreements between Dealer and Company respecting the premises covered by this agreement."

12. The "Distributor Agreement" (Plaintiff's Exhibit No. 2) contains the following clauses:

Quantity

"Company agrees to sell to Distributor, and Distributor agrees to buy from Company and stock and offer for sale all of Distributor's requirements of petroleum products used or sold or bought to be used or sold by Distributor in the conduct of his business on the premises hereinafter described. The petroleum products to meet Distributor's requirements hereunder shall be those brands of gasoline, lubricating oils and other petroleum products currently sold at service stations operated by Standard Stations, Inc. in Distributor's vicinity, and Distributor agrees not to store, handle, distribute, or sell any other brand or brands of petroleum products at or from the station."

\* \* \* \* \* \*

Other Merchandise

"Company agrees to sell or consign to Distributor and Distributor agrees to purchase or receive from Company, and stock and offer for sale, all of Distributor's requirements of tires, tubes, and batteries used or sold or bought to be used or sold by Distributor on the premises above described. The tires, tubes and batteries to be supplied Distributor hereunder shall be Company's regular line of Atlas Tires, Atlas Tubes and Atlas Batteries currently sold at service stations operated by Company in Distributor's vicinity. Company will deliver to Distributor such other Atlas merchandise currently sold by Company at service stations operated by Standard Stations, Inc., that Distributor wishes to handle hereunder, in quantities necessary in opinion of Company to meet the station's trade requirements. Whether tires, tubes, batteries and other non-petroleum merchandise which Distributor handles hereunder shall be consigned or sold to Distributor shall depend on Company's current policies, but Company will allow Distributor the commissions or the equivalent thereof in differentials below Company's selling price therefor, as set forth in the attached schedule marked schedule 'A' and hereby made a part hereof. This schedule may be modified from time to time by Company. All tires, tubes, and batteries sold or consigned to Distributor hereunder shall be sold by Distributor at not less than Company's authorized prices therefor. All expenses of the storage, handling, sale and distribution at or from the station of products and merchandise consigned or sold to Distributor under the terms of this or any other paragraph hereof shall be paid by Distributor. The proceeds of the sale of consigned merchandise shall be held by Distributor as Trustee for Company and paid over to Company on demand."

\* \* \* \* \* \*

Conduct of Distributor's Business

" \* \* \* It is understood and agreed that Distributor in the performance of this agreement is engaged in an independent business, and nothing herein contained shall be construed as reserving to Company any right to control Distributor with respect to his physical conduct in the performance of this agreement. It is further understood and agreed that Company reserves no right to exercise any control over any of Distributor's employees and that all employees of the Distributor shall be entirely under the control and direction of Distributor. Distributor undertakes and agrees that he will,

at his own expense, during the term hereof, maintain full insurance under any Workmen's Compensation Laws effective in said state covering all persons employed by and working for him in connection with the performance of this agreement, and upon request shall furnish Company with satisfactory evidence of the maintenance of such insurance. Distributor accepts exclusive liability for all contributions and payroll taxes required under the Federal Social Security Act and State Unemployment Compensation Laws as to all persons employed by and working for him in connection with the performance of this agreement."

\*   \*   \*   \*   \*   \*

Breach of Contract

"In the event Distributor shall fail to perform or fulfill any obligation imposed on Distributor herein, Company at its option may terminate this contract forthwith. The waiver by Company of any breach of any provision hereof by Distributor shall not be deemed to be a waiver of the breach of any other provision or provisions hereof, or of any subsequent or continuing breach of such provision or provisions."

13. The "Petroleum Products and Equipment Agreements," (Plaintiff's Exhibit No. 3) contain the following clauses:

"1. Standard Oil Company of California, a corporation, hereinafter called 'Company,' agrees to sell to........................ hereinafter called 'Dealer,' and Dealer agrees to buy from Company, all of Dealer's requirements of petroleum products used or sold or bought to be used or sold by Dealer at............, ........... ............., ............. The petroleum products to meet Dealer's requirements hereunder shall be those brands of gasoline, lubricating oils, and other petroleum products sold by Company to its dealers generally in Dealer's vicinity."

\*   \*   \*   \*   \*   \*

"7. In the performance of this agreement Dealer is engaged in an independent business and nothing herein contained shall be construed as reserving to Company any right to control Dealer with respect to his conduct in the performance of this agreement. Company reserves no right to exercise any control over any of Dealer's employees and all employees of the Dealer shall be entirely under the control and direction of Dealer who shall be responsible for their actions and omissions. Dealer will, at his own expense, during the term hereof, maintain full insurance under any Workmen's Compensation Laws effective in said state covering all persons employed by and working for him in connection with the performance of this agreement, and upon request shall furnish Company with satisfactory evidence of the maintenance of such insurance. Dealer accepts exclusive liability for all contributions and payroll taxes required under Federal Social Security Laws and State Unemployment Compensation Laws as to all persons employed by and working for him in connection with the performance of this agreement."

\*   \*   \*   \*   \*   \*

"9. This agreement shall not be assignable without the prior written consent of the Company. The waiver by Company of any default by Dealer shall not be deemed to be continuing waiver of such default or the waiver of the default of any other provision hereof. This agreement shall, as of the commencement date hereof, terminate all prior Dealer Agreements between Dealer and Company or Subleases from Company to Dealer respecting the premises covered by this agreement."

14. The agreement entitled "Dealer Agreement TBA" (Plaintiff's Exhibit No. 4) contains the following clauses:

"1. Standard Oil Company of California, hereinafter called 'Company' agrees to sell to .......... hereinafter called 'Dealer,' and Dealer agrees to buy from Company, all Dealer's requirements of petroleum products used, sold, or bought to be used or sold, by Dealer at .........., ........, .........., hereinafter called 'said premises.' The petroleum products to meet Dealer's requirements hereunder shall be those brands of such products generally sold by Company to its Dealers.

884

"2. Company agrees to sell or consign to Dealer and Dealer agrees to purchase or receive from Company, and stock and offer for sale, all Dealer's requirements of tires, tubes, and batteries used or sold or bought to be used or sold by Dealer on said premises. The tires, tubes and batteries to be supplied Dealer hereunder shall be those lines supplied by Company from time to time to its dealers generally. Company will deliver to Dealer such other merchandise currently sold by Company that Dealer wishes to handle hereunder, in quantities necessary in opinion of Company to meet Dealer's requirements at said premises. Whether tires, tubes, batteries and other non-petroleum merchandise which Dealer handles hereunder shall be consigned or sold to Dealer shall depend on Company's current policies but Company will allow Dealer the commissions, or the equivalent thereof in differentials below Company's selling price therefor, as set forth in the attached Schedule 'A'. Company may modify this schedule from time to time. All tires, tubes, and batteries sold or consigned to Dealer hereunder shall be sold by Dealer at not less than Company's authorized retail prices therefor. The proceeds of the sale of consigned merchandise shall be held by Dealer as trustee for Company and paid over to Company upon demand. Dealer shall be responsible for all loss of, or damage to, consigned goods belonging to Company in Dealer's possession.

"3. All expenses of the storage, handling, sale and distribution at said premises of products and merchandise consigned or sold to Dealer under this agreement shall be paid by Dealer."

"10. Dealer is engaged in an independent business and nothing herein shall be construed as reserving to Company any right to control Dealer's conduct in the performance of this agreement. Company reserves no right to control Dealer's employees, all of whom shall be entirely under Dealer's control and direction and he shall be responsible for their actions and omissions. Dealer shall, at his own expense, during the term hereof, maintain full insurance under applicable Workmen's Compensation Laws covering all persons employed by and working for him in connection with the performance of this agreement, and upon request shall furnish Company with satisfactory evidence of the maintenance of such insurance. Dealer shall pay and bear all contributions and payroll taxes required under Federal Social Security Laws and State Unemployment Compensation Laws as to all persons employed by and working for him in connection with the performance of this agreement.

"11. Dealer shall protect, defend, and hold Company harmless from and against all liability for damage to property (including Dealer's property) or injury to or death of persons, directly or indirectly resulting from any acts or omissions of Dealer or Dealer's employees on, or in connection with the operation of, said premises."

\*    \*    \*    \*    \*    \*

"13. This agreement shall not be assigned without the prior written consent of Company. The waiver by Company of any default by Dealer shall not be deemed to be a continuing waiver of such default or the waiver of any other default hereunder. This agreement shall, as of the commencement date hereof, terminate all prior Dealer Agreements, Distributor Agreements, and Agency Agreements between Dealer and Company respecting said premises."

15. The agreement entitled "Sublease" (Plaintiff's Exhibit No. 5) contains the following clause:

"4. Lessee shall handle and sell on the leased premises only such petroleum products as are sold Lessee by Lessor, and Lessee agrees not to store, handle, sell, or distribute on or from said premises any petroleum products of any description other than those petroleum products sold to Lessee by Lessor. The price payable by Lessee to Lessor for said petroleum products shall be Lessor's posted price for the same or similar products to its Dealers generally in Lessee's vicinity at time and place of delivery."

16. As of March 12, 1947 there were 7,145 written agreements of the types de-

scribed in paragraphs 11-15 herein, in full force and effect in the seven states of the Western area as follows:

Standard Stations provided and as long as said defendants were able to furnish said accessories.

| Type of Agreement | Calif. | Ariz. | Nev. | Ore. | Wash. | Ida. | Utah | Total |
|---|---|---|---|---|---|---|---|---|
| Dealer Agreement | 695 | 81 | 50 | 354 | 356 | 73 | 47 | 1656 |
| Distributor Agreement | 255 | 36 | 24 | 96 | 97 | 33 | 15 | 556 |
| Petroleum Products and Equipment Agreement | 495 | 105 | 12 | 92 | 147 | 31 | 30 | 912 |
| Dealer Agreement TBA | 943 | 160 | 37 | 293 | 474 | 166 | 148 | 2221 |
| Sublease | 678 | 82 | 42 | 322 | 435 | 116 | 125 | 1800* |
| | | | | | | | Total | 7145 |

17. As of March 12, 1947, in addition to the aforesaid 7,145 written agreements, defendants Standard and Standard Stations had oral agreements with 742 "independent dealers" pursuant to which the dealer agreed to handle and sell only the gasoline acquired from or sold to him by defendant Standard. Such "independent dealers" are sold as "open accounts" by the defendants.

17 (a). The 742 oral agreements of the type described in Paragraph 17 herein applied to 742 retail outlets located in the seven States of the Western area, as follows:

| Califor- nia | Arizona | Nevada | Oregon | Wash- ington | Idaho | Utah | Total |
|---|---|---|---|---|---|---|---|
| 429 | 50 | 22 | 77 | 124 | 19 | 21 | 742 |

18. As of March 12, 1947, in addition to the aforesaid 7,145 written agreements and the 742 oral agreements described in Paragraph 17, defendants had entered into various other oral agreements, the exact number of which is unknown, with some of the independent dealers with whom the defendants had executed "Dealer Agreements TBA" and "Distributor Agreements" (Plaintiff's Exhibits No. 4 and No. 2). Said oral agreements provided that "the independent dealer" should acquire such "automotive accessories," other than tires, tubes and batteries as he might require for use or sale at the "retail outlet" operated by him from the defendants Standard and

19. As of March 12, 1947 there were 5,937 retail outlets operated by "independent dealers," located in the seven states of the Western area which were subject to either the written or oral agreements referred to in Paragraphs 11–15, and 17. The number of "retail outlets" operating under the various written and oral agreements in seven Western states as of March 12, 1947 was as follows:

Retail outlets operating under written agreements described in paragraphs 11–15 herein     5,195

Retail outlets operating under oral agreements described in paragraph 17     742

Total     5,937

20. The total quantity and approximate dollar volume of business done between the defendants and the "independent dealers" under the 7,887 written and oral agreements at the 5,937 "retail outlets" referred to in Paragraphs 17 and 19 herein for the years 1946 and 1947 was as follows:

1946—Approximate Dollar Volume:

| Gasoline | $48,342,374.62 |
|---|---|
| Lubricating Oils | 3,246,263.83 |
| Tires and tubes | 2,692,094.00 |

* 1798 of such sublease agreements are used in conjunction with other types of the aforementioned agreements.

| | |
|---|---|
| Batteries | 352,464.00 |
| Miscellaneous Accessories | 687,557.00 |
| | $55,320,753.45 |

1946—Quantity Volume:

| | |
|---|---|
| Gasoline | 268,568,748 gals. |
| Lubricating oils | 6,067,782 gals. |
| Tires | 179,462 units |
| Tubes | 138,174 units |
| Batteries | 43,078 units |
| Miscellaneous Accessories | 2,375,162 units |

1947—Approximate Dollar Volume:

| | |
|---|---|
| Gasoline | $57,646,323.00 |
| Lubricating oils | 3,353,490.21 |
| Tires and tubes | 3,188,301.00 |
| Batteries | 669,829.00 |
| Miscellaneous Accessories | 988,469.00 |
| Total | $65,846,412.21 |

1947—Quantity Volume:

| | |
|---|---|
| Gasoline | 320,257,350 gals. |
| Lubricating oils | 6,268,206 gals. |
| Tires | 213,304 units |
| Tubes | 197,400 units |
| Batteries | 63,126 units |
| Miscellaneous Accessories | 2,526,114 units |

21. The relationship established by the written and oral contracts and agreements described in Paragraphs 11-15, and 17 between the "independent dealers" and defendants is not that of employer and employee but that of independent contractor.

22. Defendants Standard Stations have persuaded, induced, and influenced "independent dealers" to enter into the various written and oral agreements described in Paragraphs 11-15, 17, and 18 herein by various means and methods, such as (a) lending money without interest or at rates below current interest rates; (b) by making loans, portions of which were later forgiven; (c) by making gifts of money; (d) by buying equipment from the independent dealer and thereafter furnishing new equipment to said dealer without charge, or by (e) selling equipment to said dealer at less than cost. In many instances such action was taken by the defendants for the purpose of displacing competitive products then being handled by said "independent dealer" at the retail outlet or for the purpose of precluding the acquisi-

tion of such outlet by a competitor of defendants. Standard Stations has negotiated and is a party to many of the agreements described in Paragraphs 11-15 for and on behalf of defendant Standard.

23. The written agreements described in Paragraphs 11 to 15 inclusive in effect as of March 12, 1947 in the seven states of the Western area were executed and approved in the offices of defendants at San Francisco, California. The written and oral agreements contemplate the movement and distribution of goods originating in interstate commerce. There is a constant flow in interstate commerce of the products produced and distributed by defendants. The transactions under the agreements are in the course of interstate commerce; directly affect the "independent dealer"; prevent him from dealing with competitive suppliers, and directly affect the shipment of competitive goods originating in interstate sources.

24. Defendants distribute and sell, or arrange for the distribution and sale, of "petroleum products" and "automotive accessories" to "retail outlets" in the seven states of the Western area. Standard owns and operates refineries located in the State of California at Richmond, El Segundo and Segura. "Petroleum products" produced or processed thereat are sold and/or distributed to "retail outlets" throughout the seven states of the Western area. Gasoline is also purchased or otherwise acquired by Standard from the Utah Oil Refining Company located at Salt Lake City, Utah, for sale and distribution to "independent dealers" located in part of Utah and Southeastern Idaho. Quantities of gasoline are also purchased or acquired by defendants from the Standard Oil Company of Texas and shipped and distributed from said state by Standard to "independent dealers" located in the eastern part of the State of Arizona.

25. Defendant Standard sells between 12 and 14 per cent of all the gasoline sold or distributed through independent retail dealer outlets in the Western area. In the majority of States of the Western area, Standard is the largest single marketer of

gasoline through such outlets. Standard sold approximately 23 per cent of all the gasoline sold in the Western area during the year 1946.

26. The petroleum products sold and distributed throughout the Western area by defendants are known as both bulk products and as packaged goods. For the purposes of distribution of bulk products, the territory comprising the "Western area" is divided into 23 distributive divisions. Defendants supply such products to the "independent dealers" in such divisions by various transportation methods including tank cars, tank trucks, barge and tankers. In some instances defendants distribute the refined product directly from its refineries to the underground storage tanks of "independent dealers." In most instances defendants transport their products from their refineries to various bulk plants which are located throughout the seven states of the "Western area" from which plants such products are delivered by tank truck to the "independent dealer" at his "retail outlet." All the bulk plants used by defendants for distribution of petroleum products to "independent dealer" outlets throughout the Western area are owned by defendant Standard. The title, disposition and control of all "petroleum products" distributed by defendant Standard is retained by it until delivery is made to the independent dealer at his respective "retail outlet." Stocks of "petroleum products" in each of its bulk plants in the seven states of the Western area are constantly kept at an operating level by the defendant Standard.

27. Standard packages approximately all of the oils and greases sold by it to the "independent dealers" at its refineries located at Richmond, California and El Segundo, California. Some is packaged at Wilbridge, Oregon and Point Wells, Washington. Said oils and greases are distributed by Standard from these points to "independent dealers" in the "Western area." Defendants have divided the Western area into four distributive divisions for the purposes of the distribution of such packaged goods. In making such distribution Standard retains title to such packaged products until the "independent dealer" receives such goods and signs the delivery slip at his retail outlet.

28. The automotive accessory products which are sold to and/or distributed by the defendants to the independent dealer are manufactured by various concerns other than defendants, and are shipped to defendants from factories located both within and outside the states of the Western area. The majority of such products bear the Atlas brand name. Shipments of such products are made by the manufacturers thereof to accessory warehouses maintained by Standard and thereafter distributed by defendants to independent dealers at the retail outlets. The eight accessory warehouses maintained by defendants, their location and the location by states of the independent dealers served by them, are as follows:

San Francisco—serves Central and Northern California; also dealers in Northwestern Nevada; also Lakeview District in Southern Oregon.

Salt Lake City—serves all Utah, Arizona, North of Grand Canyon, Eastern and Northern Nevada and Southeastern Idaho.

Phoenix—confined to the State of Arizona and Needles across the Colorado River in California.

Los Angeles—Southern California and Southern Nevada.

Fresno—within the State of California.

Portland—Oregon, Southern Washington and Southwestern Idaho.

Seattle—Washington only.

Spokane—Eastern Washington and Northern Idaho.

29. Numerous manufacturers and producers of "petroleum products" and "automotive accessories" located both inside and outside of the states of the "Western area," other than those producers and manufacturers whose products are marketed by defendants, are prepared to and have attempted to sell their respective brands of "petroleum products," tires, tubes, batteries and miscellaneous accessories to "independent dealers" within the Western area

who have entered into the written or oral agreements described in Paragraphs 11 to 15, inclusive, 17 and 18 herein. Many manufacturers and producers have factories or refineries located in states outside the Western area and are engaged in the business of marketing their petroleum products or automotive accessories within the Western area. Other manufacturers and producers located within the Western area make, sell and distribute "petroleum products" or "automotive accessories" in interstate commerce throughout the seven states of the Western area. In many instances direct sales representatives of manufacturers and producers have unsuccessfully attempted to sell "independent dealers" who were and still are parties to the written or oral agreements described in paragraphs 11 to 15, inclusive, 17 and 18 herein.

30. The manufacturers, producers, distributors and sellers of products competitive to those sold or distributed by Standard or Standard Stations to the independent dealers have been unable to sell their "petroleum products" and "automotive accessories," have been unable to increase their sales or compete for a part of the market represented by the retail outlets under contract to defendants. The agreements, written and oral referred to in Paragraphs 11 to 15, inclusive, 17 and 18 herein, have denied to manufacturers or suppliers of such competitive products access to the 5,937 retail outlets operated by the "independent dealers."

31. The intent, purpose and effect of the exclusive supply provisions of the written and oral agreements described in paragraphs 11 to 15, inclusive, 17 and 18 herein, have been to prevent the "independent dealer" operating under said agreements from handling any "petroleum products," tires, tubes, batteries and miscellaneous accessories other than those supplied or sponsored by defendants. When the "independent dealer" handled products competitive to those manufactured or sponsored by defendants, he did not do so openly. The agreements were interpreted by the independent dealers operating under them as precluding them from handling competi-

tive products, except during the periods—especially during the war—when defendants were unable to supply the quantity demanded by the "independent dealers." The defendants reserved the right to determine the amount of tires, tubes, batteries and other accessories it would furnish the "independent dealers" operating under Distributor Agreements and Dealer Agreements TBA. Such dealers were denied access to competitive products by the provisions of the foregoing agreements which were in effect. The independent dealers have been prevented from purchasing merchandise in an open competitive market of the quality which they desire and at prices determined by free and open competition. The written and oral agreements are intended to and in practice do confine the independent dealers to defendants' petroleum products and automotive accessories handled or sponsored by defendants.

32. The direct flow of interstate commerce has been affected by the written and oral agreements described in Paragraphs 11 to 15, inclusive, 17 and 18 herein (1) by channeling the products manufactured or sponsored by defendants regardless of their interstate or intrastate source, through an exclusive group of outlets; (2) by denying the independent dealers the right to buy competitive products and (3) by denying the manufacturers of competitive products the right to sell the "independent dealers" at the "retail outlets."

Conclusions of Law.

1. Defendants Standard and Standard Stations are engaged in the manufacture, sale and/or distribution of petroleum products and automotive accessories in interstate commerce and in the course of such commerce have entered into contracts, written and oral, which provide for the sale and distribution of such petroleum products and automotive accessories to "independent dealers" in interstate commerce.

2. The written and oral agreements described in Paragraphs 11 to 15, inclusive, 17 and 18 herein, entered into between defendants and the "independent dealers" directly affect and unreasonably restrain the course of interstate commerce in pe-

troleum products and automotive accessories in violation of Sec. 1 of the Sherman Act, 26 Stat. 209, 15 U.S.C.A. § 1.

3. The written and oral contracts and agreements described in Paragraphs 11 to 15, inclusive, 17 and 18 herein entered into between the defendants Standard or Standard Stations and the "independent dealers" substantially lessen competition and tend to create a monopoly in the sale and distribution of petroleum products and automotive accessories in violation of Section 3 of the Clayton Act, 38 Stat. 731, 15 U.S.C.A. § 14.

4. The relationship established by the written and oral contracts and agreements entered into between defendants Standard or Standard Stations and the "independent dealers" as described in Paragraphs 11 to 15, inclusive, 17 and 18 herein is not that of employer and employee but is that of an independent contractor.

5. The written and oral contracts and agreements described in Paragraphs 11 to 15, inclusive, 17 and 18 herein have had the necessary and intended effect of foreclosing competition in the sale of petroleum products and automotive accessories from a substantial market for such products in seven states of the Western area.

6. The written and oral contracts and agreements described in Paragraphs 11 to 15, inclusive, 17 and 18 herein unreasonably restrain and substantially lessen competition in an appreciable segment of interstate commerce in the seven Western states of the Western area in the sale and distribution of petroleum products and automotive accessories.

7. The written and oral contracts and agreements described in Paragraphs 11 to 15, inclusive, 17 and 18 herein have had the necessary and intended effect of denying the independent dealers access to competitors' products and of locking out such dealers from the sources of products originating in interstate commerce. Such written and oral contracts and agreements also confine the independent dealers to the handling of and dealing in petroleum products and automotive accessories handled or sponsored by defendants.

8. The written and oral contracts and agreements described in Paragraphs 11 to 15, inclusive, 17 and 18 herein have had the necessary and intended effect of denying manufacturers or suppliers of petroleum and automotive accessories competitive to those manufactured or sponsored by defendants access to a substantial number of potential outlets for their products in the seven states of the Western area.

9. The number of outlets and the volume of business in petroleum products and automotive accessories foreclosed to competition by the written and oral contracts and agreements described in Paragraphs 11 to 15, inclusive, 17 and 18 herein, and in effect in the seven states of the Western area is substantial whether considered comparatively or not.

10. The provisions of the written and oral contracts and agreements described in Paragraphs 11 to 15, inclusive, 17 and 18 herein are illegal in their effect and the plaintiff is entitled to an injunction and other equitable relief as prayed for.

### APPENDIX B.

The court having rendered its opinion herein on June 7, 1948; having duly considered the proposals of the parties as to its judgment, and having filed its findings of fact and conclusions of law, wherein the defendants herein were found to have violated Section 1 of the Act of Congress of July 2, 1890, as amended, commonly known as the Sherman Act, and Section 3 of the Act of Congress of October 15, 1914, as amended, commonly known as the Clayton Act,

It Is Hereby Ordered, Adjudged, And Decreed as follows:

I. As used herein, "Standard" refers to the defendant Standard Oil Company of California; "Standard Stations" refers to the defendant Standard Stations, Inc.

As used herein, the term "retail outlet" refers to any service station or garage at which "petroleum products" and/or "automotive accessories" manufactured or "sponsored by" defendant Standard or Standard Stations are sold or distributed by an "independent dealer."

As used herein, the term "independent dealer" refers to the operator of any "retail outlet" who operates such retail outlet as an independent business enterprise and not as an employee or agent of defendant Standard or Standard Stations.

As used herein, the term "petroleum products" refers to products obtained or manufactured from natural gases or crude oil by any process and sold or used as a fuel or lubricant for automotive vehicles, together with miscellaneous oils and compounds derived from such natural gases or crude oils and designated for various specific uses and includes such petroleum products as are manufactured or "sponsored by" defendants and sold by defendants "Standard" or "Standard Stations" at any retail outlet operated by said defendants or either of them.

As used herein, the term "automotive accessories" refers to replacement parts and articles other than "petroleum products" used on or in the servicing or repairing of automotive vehicles and include tires, tubes, batteries, spark plugs, oil filters, oil filter cartridges, fan belts, battery cables, auto lamp bulbs, fuses, windshield wipers and blades, tire repair and vulcanizing kits, antifreeze preparations, tire chains, waxes and polishes and other like items and includes such "automotive accessories" as are manufactured or "sponsored by" defendants and sold by defendants "Standard" or "Standard Stations" at any retail outlet operated by said defendants or either of them.

The term "sponsored by," as used herein, refers to petroleum products and/or "automotive accessories" which are not manufactured or produced by defendants "Standard" and/or "Standard Stations."

II. Defendants Standard and Standard Stations have entered into contracts which unreasonably restrain interstate trade and commerce in petroleum products and automotive accessories in violation of Section 1 of the Act of Congress of July 2, 1890, as amended, 26 Stat. 209, 15 U.S.C. § 1, commonly known as the Sherman Act.

III. Defendants Standard and Standard Stations have entered into contracts which substantially lessen competition and tend to create a monopoly in the sale and distribution of petroleum products and automotive accessories in violation of Section 3 of the Act of Congress of October 15, 1914, as amended, 38 Stat. 731, 15 U.S.C.A. § 14, commonly known as the Clayton Act.

IV. All of the provisions of any Dealer Agreement (Government's Exhibit No. 1), Distributor Agreement (Government's Exhib.: No. 2), Petroleum Products and Equipment Agreement (Government's Exhibit No. 3), Dealer Agreement TBA (Government's Exhibit No. 4), Sublease Agreement (Government's Exhibit No. 5), and all provisions of like or similar import or effect either expressed or implied in any other agreement or instrument between defendants Standard and/or Standard Stations and any independent dealer which contain the condition, agreement or understanding that said independent dealer shall purchase or acquire for sale all his requirements of petroleum products and/or automotive accessories which are used or sold or bought to be used or sold by said independent dealer at a retail outlet from defendants, or either of them, are hereby adjudged unlawful and declared illegal and void. This declaration of illegality does not extend to other and separable provisions of said agreements or subleases which do not contain any such or similar condition, agreement or understanding.

V. All of the provisions of any oral agreement, arrangement or understanding between defendants Standard and/or Standard Stations and any independent dealer which contain the condition, agreement, or understanding, expressed or implied, that said independent dealer shall purchase or acquire for sale all his requirements of petroleum products and/or automotive accessories which are used or sold, or bought to be used or sold by said independent dealer at a retail outlet from defendants, or either of them, are hereby adjudged unlawful and declared illegal and void. This declaration of illegality does not extend to other and separable provisions of any agreements or subleases which do not contain

any such or similar conditions, agreement or understanding.

VI. The defendants Standard and Standard Stations, their successors or assigns and their officers, directors, agents, representatives, and all persons or corporations acting or claiming to act on their behalf be and they are hereby perpetually enjoined from entering into, or enforcing the provisions of any contract, agreement, or understanding, written or oral, expressed or implied, with any independent dealer or from inducing or compelling, or attempting to induce or compel, by any means whatever, any independent dealer to enter into any contract, agreement, or understanding, written or oral, expressed or implied, which requires:

(a) an independent dealer to secure all of his requirements of petroleum products from defendants or either of them or which prevents him from handling or acquiring for sale petroleum products from sources other than the defendants;

(b) an independent dealer to secure all of his requirements of any one or more automotive accessories from or through defendants or either of them, or which prevents him from handling or acquiring for sale any automotive accessories from sources other than defendants.

VII. Defendants Standard and Standard Stations, their successors or assigns, and their officers, directors, agents, representatives and all persons or corporations acting or claiming to act on their behalf be and they are hereby perpetually enjoined from selling or attempting to sell any petroleum products or any automotive accessories to any independent dealer on the condition

(a) that said independent dealer shall purchase other petroleum products or automotive accessories from the defendants, or either of them;

(b) that said independent dealer shall not handle or sell at a retail outlet petroleum products and/or automotive accessories other than those sold or sponsored by defendants.

VIII. Within sixty days after this judgment shall become operative and go into effect, defendants shall send written notice by registered mail to each independent dealer with whom a defendant then has existing written or oral contractual relations of the provisions of this decree in such form as is first approved by the attorneys for the plaintiff or by the court in the event the attorneys for the plaintiff and the defendants are unable to agree on the form of such written notice.

IX. Nothing contained in this judgment shall enjoin or restrain either defendant from selling or contracting to sell petroleum products and/or automotive accessories including such products as are sponsored by defendants, to independent dealers on the condition that any pump or tank or other container or receptacle for such products, furnished by defendant and marked as such to an independent dealer, shall be used solely for the storing, handling or dispensing of defendant's petroleum products and to prescribe by agreement or regulations not inconsistent with the provisions of this decree, for the storage, handling, or dispensing of such products.

X. Nothing contained in this judgment shall enjoin or restrain either defendant from freely selecting independent dealers to whom it will sell or contract to sell any petroleum products or automotive accessories including any such products sponsored by defendant or from declining or refusing to sell or contract to sell any petroleum products or automotive accessories including any such products sponsored by defendants, to any independent dealer provided such refusal to deal on the part of the defendants or either of them is not based on the refusal of the independent dealer to accept conditions prohibited by this decree.

XI. The enforcement of this judgment is stayed until the expiration of six (6) months from the date of the entry of this judgment and, in the event an appeal is taken from this judgment or any part thereof, the enforcement of this judgment is stayed until the expiration of six (6)

months from the date such appeal is finally determined.

XII. For the purpose of securing compliance with this judgment and for no other purpose, any duly authorized representative or representatives of the Department of Justice shall, upon written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on notice reasonable as to time and subject matter to either or both defendants, made to its principal office at San Francisco, California, and subject to any legally recognized privilege, be permitted (1) access in the presence of defendant's counsel or other representative during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of said defendant relating to any matters contained in this judgment; (2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of such defendant, who may have counsel present, regarding such matters, provided, however, that no information obtained by the means provided in this paragraph shall be divulged by the Department of Justice to any person other than a duly authorized representative of such Department except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this judgment or as otherwise required by law.

XIII. Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this judgment, for the amendment, modifications or termination of any of the provisions thereof, for the enforcement of compliance herewith and for the punishment of violations thereof.

XIV. Judgment is entered against the defendants for all costs to be taxed in this proceeding.